# Third District Court of Appeal

## State of Florida

Opinion filed January 17, 2018.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D16-1149
Lower Tribunal No. 13-16523
_____

**Thomas DePrince,**
Appellant,

vs.

**Starboard Cruise Services, Inc.,**
Appellee.


An Appeal from the Circuit Court for Miami-Dade County, Michael Hanzman, Judge.

McDonald Hopkins, and Robert A. Cohen, Mario M. Ruiz and Joelle H. Dvir, for appellant.

Isicoff, Ragatz & Koenigsberg, and Eric D. Isicoff and Carolina A. Latour, for appellee.


Before LAGOA, SCALES and LUCK, JJ.

LUCK, J.

In the 1932 movie <u>Night After Night</u>, a cloakroom attendant comments to Mae West on her ring, "Goodness, what a lovely diamond!"  Mae West, in her first movie role, responds:  "Goodness had nothing to do with it."  <u>Night After Night</u> (Paramount Pictures, 1932).  Goodness, too, had nothing to do with how Thomas DePrince bought his twenty-carat diamond.  Through a comedy of errors, and an e-mail miscommunication, a cruise line jewelry shop sold the twenty-carat diamond to DePrince for one-twentieth of its retail value.  DePrince knew the jewelry shop was selling the diamond for millions less than it should but said nothing.  This breach of contract claim arose out of the jewelry shop reversing the charges and canceling the sale once it learned about the price.  The jury, after a five day trial, found the jewelry shop made a unilateral mistake and rescinded the contract for the purchase of the diamond.  Because the trial court did not follow the holdings from the first appeal, <u>DePrince v. Starboard Cruise Servs., Inc.</u>, 163 So. 3d 586 (Fla. 3d DCA 2015) (<u>DePrince I</u>), in instructing the jury on the elements of unilateral mistake, we reverse and remand for a new trial.

**FACTUAL AND PROCEDURAL BACKGROUND**

<u>1.  The cruise.</u>  On February 11, 2013, DePrince, a passenger aboard a cruise ship, visited the ship's jewelry boutique, operated by Starboard Cruise Services, Inc., where he indicated his interest in purchasing a fifteen to twenty carat loose diamond.[1] DePrince specified he wanted an emerald cut, high quality, color D, E,

2

or F diamond with a G.I.A. certificate.[2] Because the shipboard jewelry store did not have such a diamond, the store's manager, Mr. Rusan, electronically mailed Starboard's corporate office.

Ms. Jimenez, at the corporate office, reached out to Starboard's diamond vendor in California, Sophia Fiori. Mr. Bachoura from Sophia Fiori, with some reservations because he did not believe a sale of this magnitude should take place aboard a ship, called a diamond broker in New York, Julius Klein, for its available inventory. Julius Klein sent Mr. Bachoura a list of diamonds available with the desired specifications. The list provided a per-carat price and a net price for each diamond. Mr. Bachoura selected two diamonds from the inventory listing, and electronically mailed the following information to Ms. Jimenez:

> These prices are ship sailing prices based on the lowest tier diamond margin we have. Let me know if you have any questions.
>
> EC 20.64 D VVS2 GIA VG G NON selling price $235,000
> EC 20.73 E VVS2 GIA EX EX FNT selling price $245,000

Ms. Jimenez forwarded this information to Mr. Rusan on the ship. Mr. Rusan, in turn, presented the information to DePrince and his partner, Mr. Crawford.

---

[1] "A 'loose diamond' refers only to the gemstone itself, rather than a gemstone that is a component of a larger piece of jewelry." DePrince I, 163 So. 3d at 589 n.1.
[2] "[T]he Gemological Institute of America (the 'GIA'), [is] a not-for-profit entity that grades and certifies gemstones . . . ." Zaretsky v. William Goldberg Diamond Corp., 820 F.3d 513, 516 (2d Cir. 2016)

Neither Ms. Jimenez nor Mr. Rusan had ever sold a large loose diamond before, and did not realize the quoted price was per carat. Mr. Crawford, who was a certified gemologist, asked the opinion of DePrince's sister, a graduate gemologist. Ms. DePrince warned that something was not right because the price for a diamond of that size should be in the millions and recommended not buying the diamond.

Disregarding his sister's advice, DePrince contracted with Starboard to purchase the 20.64 carat diamond for the quoted $235,000 price, paying with his American Express credit card. Shortly after the sale, Starboard discovered that the $235,000 price was per carat. Starboard immediately notified DePrince of the error and reversed the charges to his credit card. DePrince then filed the instant action seeking to enforce the parties' contract.[3]

2. DePrince I. The trial court initially granted summary judgment in favor of Starboard on June 20, 2014, based on Starboard's defense of unilateral mistake. This court reversed that judgment in DePrince I. There, the court reviewed the various tests for determining whether a party's agreement could be rescinded based on a unilateral mistake. Concluding that the panel and trial court were bound by the "four-prong test to establish unilateral mistake," the court

---

[3] DePrince's complaint also included claims for specific performance and conversion but he voluntarily dismissed those before trial.

4

held that in order to rescind an otherwise-valid contract based on a unilateral mistake, the party seeking to avoid the contract must show:

> (1) [T]he mistake was induced by the party seeking to benefit from the mistake, (2) there is no negligence or want of due care on the part of the party seeking a return to the status quo, (3) denial of release from the agreement would be inequitable, and (4) the position of the opposing party has not so changed that granting the relief would be unjust.

Id. at 592 (quotation omitted; footnote omitted). The court explained that "this panel – along with the trial court – is of course bound by" the four-prong test. Id. at 591. Later in the opinion, the court "reiterate[d] our position" that we "currently adhere[] to the four-prong test." Id. at 594. The court then went on to apply the four-prong test to the facts in the record at the summary judgment hearing.

The court concluded that there was a genuine issue of material fact on the inducement prong because "knowledge of an error is markedly different than inducement of that error." Id. As an example of inducement, the court quoted the test for fraudulent inducement, and explained in a footnote:

> We do not hold that the burden to establish inducement for purposes of the first prong of a unilateral mistake defense is the same as proving the elements for a fraudulent inducement defense, but merely use fraudulent inducement by way of example to demonstrate that inducement requires some type of action, not mere knowledge. In fact, the burden of proof cannot be the same because such a requirement would render the unilateral mistake of fact defense completely obsolete by requiring a party seeking to avoid a contract on that basis to prove fraudulent inducement, which is itself sufficient to render a contract voidable by the aggrieved party.

Id. at 592 n.6 (emphasis added).

The court also concluded that there was a genuine issue of material fact on the negligence prong. "[W]hether Starboard made a reasonable and understandable mistake or acted negligently in its handling of the sale is a disputed issue of fact," the court explained. Id. at 593. Based on this, the court reversed the summary judgment for Starboard and remanded for further proceedings because "[t]here remain genuine issues of material fact to be resolved." Id. at 598.

3. The trial. The case went to trial on April 4, 2016 on DePrince's claim of breach of contract, and Starboard's defenses of unilateral mistake and fraudulent inducement. By the end of the case the issues had been whittled down. The parties did not dispute that they entered into an agreement; the only issues were whether Starboard was excused from that agreement because it made a unilateral mistake or had been fraudulently induced into entering into it. Here are the instructions the trial court gave on the affirmative defenses:

> Now, Starboard's first affirmative defense is that it made a unilateral mistake of fact and it should be able to set aside the contract because of its mistake in quoting the price of the diamond to Mr. DePrince based upon the price quote it obtained from its vendor.
> To establish this defense Starboard must prove the following: One, that the mistake was induced by the party, here Mr. DePrince, seeking to benefit from the mistake. Inducement may occur through misrepresentations, statements, or omissions which cause the contracting party to enter into a transaction. While there may be some degree of negligence on the part of Starboard, Starboard m[u]st show that there was no inexcusable lack of due care under the circumstance on its part, the party seeking return to the status quo.

6

Starboard must also show that denial of release from the agreement would be inequitable. In other words, it would be inequitable to hold it to the contract. And it must show that Mr. DePrince did not change his position in any way and that granting relief would not be unjust.

Starboard has also asserted the affirmative defense of fraud in the inducement through nondisclosure. The Court instructs you that [in the] absence of fiduciary relationship between parties, which the Court has found as a matter of law does not exist in this case[,] [t]here is generally no duty to disclosure any facts when parties are dealing at arm's length.

However, where a party undertakes to disclose certain facts and information, that party must then disclose the entire truth then known to him regarding the disclosures he made.

In other words, I am going to try to simplify this by telling you that the law does not allow people to speak half truths. So if you decide to speak on a matter you have an obligation to disclose the whole truth regarding that particular matter.

The jury found that Starboard should be excused from performing under the contract because it committed a unilateral mistake and was fraudulently induced by DePrince. The trial court denied DePrince's motion for directed verdict on the affirmative defenses, leading to this appeal.

## STANDARD OF REVIEW

Because DePrince appeals the trial court's rulings regarding directed verdict, jury instructions, and the admission of evidence, we have multiple standards of review. "The standard of review of a trial court's ruling on a motion for directed verdict is de novo. In considering a motion for directed verdict, the trial court is required to give the benefit of all reasonable inferences to the nonmoving party and in favor of submitting the question to the jury." Diaz v. Impex of Doral, Inc., 7 So.

7

3d 591, 593 (Fla. 3d DCA 2009) (citation omitted). "The standard of review regarding jury instructions is an abuse of discretion." Smith v. Orhama Inc., 907 So. 2d 594, 596 (Fla. 3d DCA 2005). Likewise, "appellate courts review a trial court's ruling on the admissibility of evidence under an abuse of discretion standard." Bank of Am., N.A. v. Delgado, 166 So. 3d 857, 860 (Fla. 3d DCA 2015).

**DISCUSSION**

DePrince contends on appeal that the trial court erred by: (1) denying his motion for directed verdict on Starboard's fraudulent inducement affirmative defense; and (2) improperly instructing the jury on the elements of Starboard's unilateral mistake affirmative defense. DePrince also contends that the trial court made evidentiary errors by: (a) excluding as irrelevant the contract's provision that all special mail orders are non-refundable; (b) excluding evidence of a $2 million mark up price on the diamond; and (c) permitting Starboard to question DePrince as to whether he had an obligation to tell Starboard it was making a mistake on the price of the diamond.[4] We address each of these contentions below.

1.  Fraudulent Inducement Affirmative Defense: Directed Verdict Motion

---

[4] DePrince, finally, contends that the trial court should have granted his motion for summary judgment on Starboard's unilateral mistake affirmative defense. We addressed the summary judgment issue in DePrince I, finding the evidence "sufficient at the summary judgment phase of the proceedings to create a genuine issue of material fact." DePrince I, 163 So. 3d at 592.

8

DePrince, first, argues that the trial court should have granted his directed verdict motion on Starboard's fraudulent inducement affirmative defense because Starboard did not present evidence that DePrince induced it to offer the diamond for millions less than it was worth. Starboard responds that DePrince made a single representation to have the diamond shipped to the GIA in New York. Once he made this partial misrepresentation, Starboard continues, DePrince had a duty to tell the manager everything, including that the diamond was worth much more.

Starboard has the law right. In a general commercial transaction like this one, "there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." Watkins v. NCNB Nat'l Bank of Fla., N.A., 622 So. 2d 1063, 1065 (Fla. 3d DCA 1993) (quotation omitted). However, "even though a party to a transaction owes no duty to disclose facts within his knowledge, or to answer inquiries respecting such facts, if he undertakes to do so he must disclose the whole truth." Ramel v. Chasebrook Const. Co., 135 So. 2d 876, 882 (Fla. 2d DCA 1961); see also Gutter v. Wunker, 631 So. 2d 1117, 1118-19 (Fla. 4th DCA 1994) ("[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed."); Nicholson v. Kellin, 481 So. 2d 931, 936 (Fla. 5th DCA 1985) ("[E]ven assuming that a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries

9

respecting such facts, if he undertakes to do so he must disclose the whole truth."). Once a party dips her toe into the material representation waters, in other words, she is required to jump all the way in head first.

Starboard is wrong, however, that DePrince's shipping instructions were a half-truth compelling him to disclose what he knew about the diamond. We need only compare what DePrince said with those partial representations that the Florida courts have declared to create a duty to disclose the whole truth. In Ramel, for example, the sellers represented to the homebuyers that the house "was well constructed and well built" even though the sellers knew during construction that the foundation was settling, the pool was sinking and pulling the patio with it, and the home had cracks that had been sealed. Ramel, 135 So. 2d at 878-79. In Vokes v. Arthur Murray, Inc., 212 So. 2d 906 (Fla. 2d DCA 1968), the dancing school instructor told his student that she had grace, excellent potential, and was developing into a beautiful dancer even though the instructor knew this was not true. Id. at 908. And in Nicholson, the conspirators represented to the investors that the business opportunity had "guaranteed returns and profits" even though the conspirators knew the business was being run as a Ponzi scheme. Nicholson, 481 So. 2d at 934-35.

In each case, that is, the seller made a partial representation about the quality or quantity of the product being sold: the quality of the home in Ramel; the quality

of the student's dancing in <u>Vokes</u>; and the quantity of money to be gained in the business opportunity in <u>Nicholson</u>. Here, DePrince did not make a factual representation about the quality or quantity of the diamond. His statement to the jewelry store manager was an instruction on where he wanted the diamond to be shipped after the purchase, no different than if he asked to have the diamond wrapped in tissue paper with a bow on top or to have a copy of his credit card receipt mailed to his home. These statements do not communicate anything about the diamond or the transaction; they are not material facts about the quality and quantity of the diamond that would affect the seller and buyer's decisions to enter into the transaction. On the other hand, if DePrince told the jewelry store manager that the store was getting such a good deal on the diamond that it was like Starboard was picking his pocket; or if DePrince said that the deal was worth it only because the quality of the diamond was so poor; these statements would create the duty to tell all he knew about the transaction.

Without this kind of material representation, the general rule applies that DePrince and Starboard owed no duty to each other to disclose facts that they could have discovered through due diligence. Because the one fact Starboard relies on was not a half-truth that would trigger a duty to tell the whole-truth, DePrince did not owe a duty to disclose what he knew about the true value of the diamond and he did not fraudulently induce Starboard into entering the sales

11

agreement. The trial court should have directed a verdict on Starboard's fraudulent inducement affirmative defense, and erred by not doing so.

## 2. Unilateral Mistake Affirmative Defense: Jury Instruction

Even though we conclude that a verdict should have been directed for DePrince on the fraudulent inducement affirmative defense, we must also address his other arguments because the jury alternatively found that Starboard was excused from performing under the contract as a result of Starboard's unilateral mistake. As to unilateral mistake, DePrince contends the trial court erred when it instructed the jury on the elements of the defense. Specifically, DePrince claims it was error to instruct the jury on the first prong that Starboard could be induced by omissions rather than some kind of action, and on the second prong that some degree of negligence by Starboard was excusable in selling the diamond at the wrong price.

### a. What are the holdings of DePrince I?

Sometimes finding the holdings in a judicial opinion can be like searching for diamonds in a coal mine – hard and messy. Thankfully, DePrince I is not one of those cases. Its holdings are clear because the court told us in clear language, three times, that we were bound by the four-part test for unilateral mistake from Rachid v. Perez, 26 So. 3d 70 (Fla. 3d DCA 2010).

12

- First time. "This Court's most recent decisions on this topic clearly articulated and reaffirmed the viability of the four-prong test to establish a unilateral mistake, [citing Rachid], and this panel – along with the trial court – is of course bound by that decision." DePrince I, 163 So. 3d at 591.

- Second time. "This Court has held that in order to rescind an otherwise-valid contract based on unilateral mistake, the party seeking to avoid the contract must show: '(1) [T]he mistake was induced by the party seeking to benefit from the mistake, (2) there is no negligence or want of due care on the part of the party seeking a return to the status quo, (3) denial of release from the agreement would be inequitable, and (4) the position of the opposing party has not so changed that granting the relief would be unjust.'" Id. at 591-92 (quoting Rachid, 26 So. 3d at 72).

- Third time. "To reiterate our position on unilateral mistake of fact, this Court currently adheres to the four-prong test as stated in Rachid [and another case]." Id. at 594.

Even the dissenting opinion conceded that "[t]he DePrince I court determined that, among competing tests for the application of the unilateral mistake of fact defense,

13

this District's case law required that the four-prong test applied to DePrince's claim," and quoted from Rachid. Dissenting Op. at 2 & n.1.

The DePrince I court applied the four-part test to the trial court's summary judgment for Starboard on its unilateral mistake defense. DePrince I, 163 So. 3d at 588 (DePrince "appeals the trial court's order granting summary judgment in favor of Starboard . . . on DePrince's claims against Starboard for breach of contract, specific performance, and conversion."); see also id. at 591 ("On appeal, Starboard has raised two defenses to the sales agreement's formation and enforcement. First and primarily, Starboard claims that a unilateral mistake of law prevents the contract from being formed."). As to the inducement prong, the court explained "that inducement requires some type of action," like making a false statement of material fact – "mere knowledge" was not enough – in concluding that there was no evidence of inducement. Id. at 592 & n.6. As to the negligence prong, the court held that "whether Starboard made a reasonable and understandable mistake or acted negligently in its handling of the sale is a disputed issue of fact." Id. at 593. Because there was a genuine issue of material fact on both prongs, the court reversed the summary judgment for Starboard and remanded for further proceedings. Id. at 588.

The court, in sum, decided four questions of law in DePrince I: First, this court and the trial court were bound to apply the four-prong test from Rachid in

14

analyzing Starboard's unilateral mistake affirmative defense. Second, the inducement prong required the inducing party to make a false statement or engage in some type of action; mere knowledge was not enough. Third, the absence-of-negligence prong required the jury to find that the mistake was not the result of Starboard's negligence or want of due care. Fourth, based on this legal framework of the inducement and negligence prongs, there were genuine issues of material fact as to these elements, and the summary judgment for Starboard had to be reversed.

The dissenting opinion calls "ancillary" and "non-essential dicta" the second holding in DePrince I that the inducement prong required the inducing party to make a false statement or engage in some type action; that mere knowledge was not enough. Dissenting Op. at 5-6. The dissenting opinion is wrong for two reasons.

First, the dissenting opinion says that because DePrince I used the expression "even if" before concluding that "knowledge of an error is markedly different than inducement of that error," that means the sentence is not essential to DePrince I's ultimate decision on summary judgment. But the dissenting opinion selectively quotes DePrince I by hacking off the first part of the sentence. The unhacked full sentence reads: "More importantly, we note that even if DePrince had known that the price he was quoted to purchase the diamond was in error,

15

knowledge of an error is markedly different than inducement." DePrince I, 163 So. 3d at 592 (emphasis added). A rationale labeled more important than others cannot be "ancillary" and "non-essential."

Second, the dissenting opinion assumes that any alternative rationales a court gives for its decision after the first one are non-essential dicta. This is not the law. "[W]here a decision rests on two or more grounds, none can be relegated to the category of obiter dicta." Clemons v. Flagler Hosp., Inc., 385 So. 2d 1134, 1136 n.3 (Fla. 5th DCA 1980) (Schwartz, J.) (alteration in original) (quoting Woods v. Interstate Realty Co., 337 U.S. 535, 537 (1949)). "It has long been settled that all alternative rationales for a given result have precedential value. 'It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion.'" McLellan v. Mississippi Power & Light Co., 545 F.2d 919, 925 n.21 (5th Cir. 1977) (en banc) (quoting Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 340 (1928)).

With regard to the inducement prong of the unilateral mistake test, the DePrince I court gave two grounds for its conclusion that summary judgment for Starboard was due to be reversed. The first was that "DePrince . . . denied that he knew there had been a pricing mistake in his affidavit, which is sufficient at the summary judgment phase of the proceedings to create a genuine issue of material fact." And the second was that "even if DePrince has known that the price he was

16

quoted to purchase the diamond was in error, knowledge of the error is markedly different than inducement of that error." Just as in <u>Clemons</u> and <u>McLellan</u>, we do not discard one ground in favor of another, but rather treat them as alternative holdings and give them equal precedential value.[5]

### b. Did the trial court follow *DePrince I* in its unilateral mistake jury instructions?

We, next, consider whether the trial court instructed the jury on the four prong test spelled out in <u>DePrince I</u>. We agree with DePrince that the trial court instructed the jury on four-prongs but it did not follow the articulation of those prongs by <u>DePrince I</u>.

---

[5] The dissenting opinion spends a lot of time talking about the limitations of the law of the case doctrine in summary judgment cases, citing Florida Supreme Court cases from the 1950s and Judge Padovano's treatise on appellate law. Judge Padovano, and the dissenting opinion, are, of course, right that in the run-of-the-mill summary judgment case, the law of the case doctrine is "unlikely" to be implicated because all the court is doing is determining whether there's a genuine issue of material fact on the essential elements of the plaintiff's claim, which facts may change as the case progresses to trial (as happened in the <u>Myers</u> cases). In the run-of-the-mill case, the elements of the cause of action or affirmative defense are not in dispute. The court in the run-of-the-mill case doesn't have to decide on the elements of breach of contract or negligence. Those have been the same since Lincoln was riding circuit in Illinois.

But <u>DePrince I</u> was not a run-of-the-mill summary judgment case. In <u>DePrince I</u>, because of "the great deal of confusion in the case law," the court first had to define unilateral mistake before it could rule on whether there was a genuine dispute about the evidence of unilateral mistake. Defining what unilateral mistake meant was as pivotal and necessary to <u>DePrince I</u>'s decision as the conclusion that there were disputed facts.

17

On the inducement prong, the trial court defined inducement for the jury as "misrepresentations, statements, or omissions which cause the contracting party to enter into a transaction." Defining inducement as making misrepresentations and statements is correct, but the trial court went astray by telling the jury that an omission of information can be an inducement. DePrince I was clear "that inducement requires some type of action, not mere knowledge," and as an example gave making a false statement. Id. at 592 & n.6. To be a unilateral-mistake inducement, the DePrince I court explained, the inducing party had to act in some way to induce the other party into making a mistake. Knowing material information but omitting to tell the other party was not enough for the first prong of the unilateral mistake test.

The DePrince I court gave one example of action satisfying the inducement prong: making a false statement, such as if DePrince had told the jewelry store manager, "You're getting a great deal." We can think of some others. If DePrince had drummed up other, less than $235,000 offers for the diamond to show the jewelry store it should jump on his full price offer for $235,000. Or if DePrince kept hounding the jewelry store manager to do the deal because of the big commission the manager would get on the $235,000 sale. These examples are "some kind of action" more than the omission of information but less than making a false statement like in a fraudulent inducement case.

18

The trial court's definition of inducement allowed the jury to find Starboard made a unilateral mistake based solely on DePrince omitting to disclose material information that was available to both parties. While the trial court has broad discretion in crafting the jury instructions so they are an understandable and accurate statement of the law, that discretion does not extend to instructing the jury contrary to the law. The trial court's definition of inducement in the unilateral mistake instruction was contrary to DePrince I.

There, also, is a problem with the trial court's unilateral mistake instruction on the negligence prong. The trial court instructed the jury that "[w]hile there may be some degree of negligence on the part of Starboard, Starboard m[u]st show that there was no inexcusable lack of due care under the circumstance on its part, the party seeking to return to the status quo." The "some degree of negligence" language was contrary to DePrince I's articulation of the negligence prong. In DePrince I, the court described the negligence prong this way: "the party seeking to avoid the contract must show . . . there is no negligence or want of due care on the part of the party seeking a return to the status quo." Id. at 592 (emphasis added).

The trial court's instruction allowed the jury to find that Starboard could be a little or somewhat negligent, just not inexcusably negligent. The trial court, in other words, made it so Starboard could have been negligent about the price for the

19

diamond, and still be entitled to rescind the contract. The "some degree of negligence" language lightened the burden on Starboard.

The dissenting opinion would not grant a new trial because the "no negligence" language, it says, was "dicta." Dissenting Op. at 7. The dissenting opinion explains that the trial court's jury instruction was consistent with other language in DePrince I suggesting some negligence was allowed for unilateral mistake as long as the negligent party wasn't "unduly negligent." Dissenting Op. at 7-9. The dissenting opinion is wrong for two reasons.

First, DePrince I, three times, said we and the trial court were bound to follow the "no negligence" language. It is as holding as holding gets. For example, on page 591, DePrince I said: "This Court's most recent decisions on this topic clearly articulated and reaffirmed the viability of the four-prong test to establish a unilateral mistake, [citing Rachid], and this panel – along with the trial court – is of course bound by that decision." DePrince I, 163 So. 3d at 591 (emphasis added). The "most recent decision" the court was bound by was Rachid, which had held the party asserting unilateral mistake must show "there is no negligence or want of due care on the part of the party seeking a return to the status quo." Rachid, 26 So. 3d at 72.

Later on page 591 and into page 592, DePrince I said: "This Court has held that in order to rescind an otherwise-valid contract based on a unilateral mistake,

20

the party seeking to avoid the contract must show . . . 'there is no negligence or want of due care on part of the party seeking a return to the status quo." DePrince I, 163 So. 3d at 591-92 (footnote omitted) (quoting Rachid). And to underscore the test for unilateral mistake, DePrince I said: "To reiterate our position on unilateral mistake of fact, this Court currently adheres to the four-prong test as stated in Rachid and Lechuga. Id. at 594 (emphasis added). The four-prong test "as stated" in Rachid and Lechuga included that "there [be] no negligence or want of due care on part of the party seeking a return to the status quo." Rachid, 26 So. 3d at 72; Lechuga v. Flanigan's Enters., Inc., 533 So. 2d 856, 857 (Fla. 3d DCA 1988). Call DePrince I wrong; call it repetitive; but there can be no doubt that DePrince I held that unilateral mistake required "no negligence" on the part of the party seeking to undo the otherwise-valid contract.

Second, even if DePrince I could be read to allow for some negligence by the party claiming mistake, that cannot be the holding of the case. Rachid and Lechuga held that a party claiming unilateral mistake must show "no negligence or want of due care," and a later panel could not recede from this holding without the approval of the en banc court or the supreme court. See State v. Washington, 114 So.3d 182, 188-89 (Fla. 3d DCA 2012) ("This panel is not free to disregard, or recede from, [a prior decision from this Court]; only this Court, sitting en banc, may recede from an earlier opinion."). To the extent there was conflict between

21

the language in <u>DePrince I</u> and <u>Rachid</u> and <u>Lechuga</u>, <u>DePrince I</u> could not recede from the clear holdings in the earlier cases. The "no negligence" standard was binding precedent, and the trial court was as bound to follow it as we are.[6]

### c. What to do on remand?

Rather than send this back for a new trial, DePrince asks us to direct a verdict for him because even if the jury had been properly instructed there was no evidence that he induced Starboard or Starboard made a mistake. We decline to do so. Now that the jury instructions are clear, it should be for the trial court in the first instance to determine after a new trial whether the evidence, with all reasonable inferences in favor of Starboard – the nonmoving party – was sufficient to meet the first (inducement) and second (negligence) prongs of the unilateral mistake test. Allowing the trial court to make the directed verdict determination in the first instance after a new trial is consistent with the Florida Rules of Civil Procedure, which invest the trial court with the directed verdict determination, and

---

[6] The dissenting opinion also disagrees that the holdings of <u>DePrince I</u> were meant to guide the trial court on "how a jury should be instructed." Dissenting Op. at 9. This is not correct. <u>DePrince I</u> reviewed the standard jury instruction for unilateral mistake, and then rejected it because: it "ha[d] not been adopted or cited by any Florida decision"; the standard instructions "are not binding precedent"; and "because there are definitive cases in this jurisdiction, we are bound by those cases." <u>DePrince I</u>, 163 So. 3d at 594 (citation omitted). In the next sentence, <u>DePrince I</u> said that our binding precedent "clearly applied the four-prong test." <u>Id.</u> Two paragraphs later, the court "reiterate[d] [its] position on unilateral mistakes of fact": "this Court currently adheres to the four-prong test as stated in <u>Rachid</u> and <u>Lechuga</u>." <u>Id.</u> <u>DePrince I</u> had jury instructions in mind when it reiterated that the district was bound by the four-prong test.

our role in the judicial hierarchy, which is to review the decisions of the trial court and correct errors that must be corrected.

### 3. Evidentiary Issues

We consider, finally, DePrince's three claims of evidentiary errors made during the trial: (a) DePrince was prohibited from bringing up the language in the invoice that special mail orders were nonrefundable; (b) DePrince was prohibited from eliciting testimony that the retail price of the diamond was marked up by $2 million from what Starboard was charged by its supplier; and (c) Starboard was allowed to ask DePrince about his legal obligation to disclose what he knew about the true price of the diamond. None of these evidentiary issues, separately or together, constituted reversible error warranting a new trial. Because, however, we are remanding this case for a new trial on unilateral mistake, it would be helpful to address one of DePrince's evidentiary claims. See Richardson v. State, 706 So. 2d 1349, 1356 (Fla. 1998) ("[F]or the sake of judicial efficiency, we address some of the issues raised in Richardson's appeal for the benefit of the trial court on remand."); Griffin v. Kia Motors Corp., 843 So. 2d 336, 339 (Fla. 1st DCA 2003) ("Although we find no reversible error as to any of Griffin's remaining issues, because this case must be remanded for new trial, we consider it helpful to address certain of them.").

During trial, Starboard asked DePrince the following questions:

23

- So you didn't have any obligation once you found out the quote was ten times below based on your sister's research, you had no obligation to say anything to anybody. That's your view?

- Mr. DePrince, that's your view, that you had this information from your graduate gemologist sister, your companion who is a gemologist telling you this price is ten times higher, just some quick research and your view is you have no obligation to say anything to anybody?

- Given the fact that Mr. Crawford had communicated with your sister at this point and through the secret code system, you now had an understanding, before any purchase had occurred, that this price that was being quoted to you, even based on her research was ten times below what it should cost, your belief was you didn't have any obligation to say anything; isn't that right?

- Did you think you had an obligation to say something with the information that you had?

DePrince objected that this called for a legal conclusion and was irrelevant. The trial court instructed the jury that it could consider DePrince's testimony for what "he felt would have been appropriate to do at the time," overruled the objections, and had DePrince answer the question. (DePrince testified, "No, I don't.")

We agree it was error to allow Starboard to ask these questions. As we noted earlier, in the run-of-the-mill commercial transaction, "there is no duty imposed on either party to act for the benefit or protection of the other party, or to disclose facts that the other party could, by its own diligence have discovered." Watkins, 622 So. 2d at 1065. DePrince's view of his obligation is not relevant to what his obligation actually was under Florida law. This would be like asking a witness to a car accident whether he felt he had an obligation to help the injured.

24

The law does not impose a duty on a bystander to act, and his opinion on this common law rule does not make it more or less so. See Lacey v. United States, 98 F. Supp. 219, 220 (D. Mass. 1951) ("It is well settled common law that a mere bystander incurs no liability where he fails to take any action, however negligently or even intentionally, to rescue another in distress.").

While DePrince, like Mae West, may not have acted with "goodness" in buying his diamond, his opinion about not having the obligation to disclose what he knew about the diamond Starboard was selling was not relevant to whether Starboard made a unilateral mistake or DePrince fraudulently induced Starboard into entering into the contract. These questions should not be asked at the new trial.

**CONCLUSION**

We end on this note. The principle of unilateral mistake, as the DePrince I court explained, "appears to be a confusing area of the law with inconsistent application among Florida's district courts of appeal." DePrince I, 163 So. 3d at 591. "The existence of three different tests has caused a great deal of confusion in the case law and to litigants and trial courts." Id. at 595.

The record shows the trial court struggling to address this confusion. Despite its good faith efforts to reconcile the cases, we, ultimately, conclude that the trial court strayed too far from DePrince I. We look forward to one day having

25

less confusion and inconsistency in the application of unilateral mistake, but until then, <u>DePrince I</u> controls our decision in this case. The judgment for Starboard is reversed and the case is remanded for entry of a directed verdict on Starboard's fraudulent inducement affirmative defense, and a new trial on its unilateral mistake affirmative defense.

Reversed and remanded with instructions.

LAGOA, J., concurs.


**DePrince v. Starboard Cruise Services, Inc.**
**#3D16-1149**


SCALES, J. (dissenting)

I respectfully dissent, and would affirm the final judgment rendered upon the jury's verdict for defendant, Starboard Cruise Services, Inc. In my view, the trial court did not abuse its discretion when it instructed the jury on the unilateral mistake of fact defense, properly conforming its instructions to the law of the case as established in <u>DePrince v. Starboard Cruise Services, Inc.</u>, 163 So. 3d 586 (Fla. 3d DCA 2015) ("<u>DePrince I</u>").

**I.     Relevant Background**

This is a textbook unilateral mistake of fact case.

Mr. DePrince, an experienced buyer of diamonds, approached Starboard's cruise ship kiosk, seeking to purchase a large diamond. Starboard quoted Mr. DePrince the per carat price for the large diamond, mistakenly representing it as the price for the diamond itself. After Mr. DePrince was provided with the erroneous price quotation, he consulted with two gemologists, both of whom informed Mr. DePrince that there must be something wrong with the extraordinarily low price Starboard had quoted for the diamond. Rather than pointing out this pricing concern to Starboard, DePrince exploited Starboard's pricing error and entered into the subject contract. Immediately upon becoming aware of its error – within 24 hours of the contract's execution – Starboard notified Mr. DePrince of its error and sought to terminate the contract, rather than to sell Mr. DePrince a 20.64 carat diamond for the contracted-for price of $235,000.

After Mr. DePrince sued Starboard for failing to honor the contract, the trial court initially entered a summary judgment for Starboard, which we reversed in DePrince I. The DePrince I court determined that, among competing tests for the application of the unilateral mistake of fact defense, this District's case law required that the four-prong test applied to DePrince's claim.[7] DePrince I, 163 So.

_____

[7] DePrince I states the four-prong test as follows:

> [I]n order to rescind an otherwise-valid contract based on a unilateral mistake, the party seeking to avoid the contract must show: . . . (1) [T]he mistake was induced by the party seeking to benefit from the mistake, (2) there is no negligence or want of due care on the part of

27

3d at 592. The DePrince I court then determined that genuine issues of material fact existed as to prongs (1) and (2), precluding summary judgment. Id. at 592-93.

The case proceeded to trial, leaving to the jury to decide whether Starboard should prevail on its unilateral mistake of fact defense: that is, whether Starboard should be excused from performing its contract because of its pricing mistake. Relevant here, the trial court gave the jury the following instruction on the defense's inducement prong: "Inducement may occur through misrepresentations, statements, or omissions which cause the contracting party to enter the transaction."

Also relevant here, the trial court gave the jury the following instruction on the negligence prong: "While there may be some degree of negligence on the part of Starboard, Starboard must show that there was no inexcusable lack of due care under the circumstances on its part, the party seeking return to the status quo." The

---

the party seeking a return to the status quo, (3) denial of release from the agreement would be inequitable, and (4) the position of the opposing party has not so changed that granting relief would be unjust.

DePrince I, 163 So. 3d at 592 (citations omitted). As discussed below in more detail, other portions of DePrince I express the lack-of-negligence prong differently. The continuing viability of this four-prong test is questionable in light of the Florida Supreme Court's June 2013 promulgation of Standard Jury Instruction 416.26. Fla. Std. Jury Instr. (Civ.) 416.26. In re Standard Jury Instructions – Contract and Bus. Cases, 116 So. 3d 284 (Fla. 2013). This jury instruction essentially adopts the Restatement (Second) of Contracts test for the unilateral mistake defense.

28

jury returned a verdict for Starboard, finding that Starboard was excused from performance of its contract with Mr. DePrince, because of Starboard's pricing mistake. The majority reverses the judgment for Starboard, and remands for a new trial. The majority concludes, among other things,[8] that the trial court abused its discretion when instructing the jury on prongs (1) and (2) of the unilateral mistake defense by not following the law of case that the majority concludes was established in DePrince I.

**II. Analysis.**

*(i) Introduction – Dicta does not constitute "law of the case"*

As the trial court did, I view both DePrince I's preclusive effect and DePrince I's pronouncements that constitute law of the case, more narrowly than the majority.

I agree with the majority that two questions of law decided in DePrince I constitute law of the case: (1) the four-prong test applies to Starboard's defense, and (2) genuine issues of material fact regarding the inducement prong and the lack-of-negligence prong in the then-existing record preclude summary judgment.[9] Where the majority and I part ways, though, is the majority's conclusion that non-

_____

[8] I would affirm the trial court's rulings on the evidentiary issues raised in DePrince's appeal, see majority opinion at 23-26, and, because I would affirm the jury's verdict, I would not need to reach the directed verdict issue. See majority opinion at 8.

[9] No error is alleged regarding these two DePrince I law of the case holdings, and these two holdings are not implicated in this appeal.

essential, ancillary language in <u>DePrince I</u>, elaborating on the inducement and lack-of-negligence prongs, *also* constitutes law of the case. <u>See</u> majority opinion at 14-18.　　Given that <u>DePrince I</u> turned on a discrete, procedural, summary judgment issue – whether the existence of disputed facts precluded summary judgment – I cannot read the ancillary language in <u>DePrince I</u> as more than dicta.[10] I am not comfortable concluding, as does the majority, that <u>DePrince I</u>'s non-essential language – contained in an opinion that merely decides that fact issues preclude summary judgment – conclusively dictates the wording of jury instructions given by the trial court after a jury trial.

(*ii) Inducement Prong*

With regard to the inducement prong, <u>DePrince I</u> held: "DePrince . . . denied that he knew there had been a pricing mistake in his affidavit, which is sufficient at the summary judgment phase of the proceedings to create a genuine issue of material fact." <u>DePrince I</u>, 163 So. 3d at 592.

---

[10] Florida's law of the case doctrine bars consideration of a point of law that was actually considered and decided in a former appeal. <u>U.S. Concrete Pipe Co. v. Bould</u>, 437 So. 2d 1061, 1063 (Fla. 1983). Because a district court of appeal's dicta is not "essential to the decision of that court and is without force of precedent," <u>State ex rel. Biscayne Kennel Club v. Bd. of Bus. Regulation of the Fla. Dept. of Bus. Regulation</u>, 276 So. 2d 823, 826 (Fla. 1973), then, by definition, an appellate court's dicta cannot implicate the doctrine. <u>Golden vs. State</u>, 528 So. 2d 50, 51 (Fla. 1st DCA 1988).

Yet, the majority suggests that the following ancillary, non-essential passage from DePrince I – immediately following DePrince I's actual holding quoted above – constitutes law of the case:

> [E]ven if DePrince had known that the price he was quoted to purchase the diamond was error, knowledge of an error is markedly different than inducement of that error. See, e.g. Gemini Investors III, L.P. v. Nunez, 78 So. 3d 94, 97 (Fla. 3d DCA 2012) (explaining that fraudulent inducement requires that the party seeking to enforce the contract "(1) made a statement concerning a material fact, (2) knowing that the statement was false, (3) with the intent that the [mistaken party] act on the false statement; and (4) the [mistaken party was] damaged as a result of [its] reasonable reliance on the false statement"). [Footnote 6.]

Id. (emphasis supplied)

> Footnote 6 of DePrince I then explains:

> We do not hold that the burden to establish inducement for purposes of the first prong of a unilateral mistake defense is the same as proving the elements for a fraudulent inducement defense, but merely use fraudulent inducement by way of example to demonstrate that inducement requires some type of action, not mere knowledge. In fact, the burden of proof cannot be the same because such a requirement would render the unilateral mistake of fact defense completely obsolete by requiring a party seeking to avoid a contract on that basis to prove fraudulent inducement, which is itself sufficient to render a contract voidable by the aggrieved party. Mazzoni Farms, Inc. v. E.I DuPont De Nemours & Co., 761 So. 2d 306, 313 (Fla. 2000) ("It is axiomatic that fraudulent inducement renders a contract voidable . . . .").

Id. at 592 n.6; see majority opinion at 5, 14.

In DePrince I, the Court definitively concluded that Mr. DePrince's knowledge of the pricing error is a disputed fact precluding summary judgment;

31

thus this *entire* passage is non-essential dicta. Further, footnote 6, relied upon by the majority, see majority opinion at 14, 17, which explains the citation to the Gemini Investors fraudulent inducement case, expressly cautions against conflating the unilateral mistake of fact defense with the intentional tort of fraud in the inducement. DePrince I, 163 So. 3d at 592 n.6. Plainly, the footnote's statement that "inducement requires some type of action, not mere knowledge" explains the inducement prong of the intentional tort of fraud, and has, in my view, little relation to the unilateral mistake of fact defense. See Md. Cas. Co. v. Krasnek, 174 So. 2d 541 (Fla. 1965); Pa. Nat'l Mut. Cas. Ins. Co. v. Anderson, 445 So. 2d 612, 613 (Fla. 3d DCA 1984).

In both Krasnek and Anderson, the unilateral mistake of fact defense was asserted successfully even though the respective plaintiffs in those cases did far less to induce the mistakes than did Mr. DePrince. I am unable to make the leap made by the majority that the statement in DePrince I's footnote 6 – explaining an intentional tort citation, following non-essential speculation about evidence that may or may not be developed at trial – should be extrapolated to inform, much less govern, the jury instructions for Starboard's unilateral mistake of fact defense.

(*iii) Lack-of-Negligence Prong*

With regard to the lack-of-negligence prong, De Prince I held: "DePrince avers in both his complaint and affidavit that Starboard did **not** act with due care

32

when it sold him the diamond. Starboard claims it simply provided DePrince with the quote provided to it . . ., and that it did not act negligently. Thus, whether Starboard made a reasonable and understandable mistake or acted negligently in its handling of the sale is a disputed issue of fact . . . ." DePrince I, 163 So. 3d at 593 (emphasis in original).

Notwithstanding this rather unambiguous and unremarkable holding, the majority concludes that the DePrince I Court adjudicated much more. Relying on dicta from DePrince I – specifically, DePrince I's first iteration of the lack-of-negligence prong – the majority asserts that DePrince I actually determined the burden Starboard was required to meet regarding the lack-of-negligence prong, and that the trial court's jury instructions impermissibly lessened that burden. See majority opinion at 19-20. DePrince I, however, was not a case about how a jury should be instructed on the lack-of-negligence prong.  Illustrating as much, DePrince I expresses the prong in *four* markedly different and distinct ways:

(i) "[I]n order to rescind an otherwise-valid contract based on a unilateral mistake, the party seeking to avoid the contract must show . . . 'there is no negligence or want of due care on the part of the party seeking a return to the status quo[.]'" DePrince I at 591-92 (citations omitted);

(ii) "[T]he party seeking to avoid the contract [must establish it] was not inexcusably negligent or failed to act with due care." Id. at 592-93;

33

(iii) "[B]oth the two-and the four-prong tests require that the party seeking to invoke a unilateral mistake of fact as an affirmative defense [must] establish that he was not unduly negligent in forming the contract[.]" Id. at 593; and

(iv) "[W]hether Starboard made a reasonable and understandable mistake or acted negligently in its handling of the sale is a disputed issue of fact[.]" Id. at 593.

Possibly, having to prove that one's mistake either was "*reasonable* and *understandable*" (the standard articulated in DePrince I's fourth iteration of the prong) or was not "*unduly* negligent" (the standard articulated in DePrince I's third iteration of the prong) is less burdensome than having to prove one's mistake is "*inexcusably* negligent" (the standard articulated in DePrince's I's second iteration of the prong); and, arguably, any of those three standards is less burdensome than having to prove one's mistake results from "no negligence" (the standard in DePrince I's first iteration of the prong).

But, if DePrince I's articulation of the lack-of-negligence prong was intended to be law of the case, governing jury instructions and the burden of proof flowing therefrom, then surely the DePrince I Court would not have stated the prong so differently throughout its opinion. DePrince I, though, did not turn on any distinctions in how the prong is stated. DePrince I merely determined that a fact issue regarding the lack-of-negligence prong precluded summary judgment. Hence,

34

all of <u>DePrince I</u>'s varying iterations of the prong are dicta and none constitute law of the case.

While the subject jury instructions are, indeed, consistent with <u>DePrince I</u>'s iteration of the prong, I disagree with the majority's conclusion that the <u>DePrince I</u> Court *actually adjudicated* the issue of how a jury should be instructed on the lack-of-negligence prong; therefore, in my view, <u>DePrince I</u> created no law of the case in this regard. <u>Fla. Dep't of Transp. v. Juliano</u>, 801 So. 2d 101, 107 (Fla. 2001) (rejecting this Court's application of the doctrine and holding that law of the case doctrine bars consideration only of those legal issues that were actually considered and decided in the former appeal). In any event, I see no abuse of discretion in the trial court's instructions to the jury on what type of mistake the jury may find excusable. I view the given instruction entirely consistent with Florida Supreme Court precedent. <u>See</u> <u>Krasnek</u>, 174 So. 2d at 543 (holding that the trial court did not err in granting rescission based on the unilateral mistake defense after finding that some degree of negligence underlay the alleged mistake).[11]

*(iv) Myers I and Myers II*

---

[11] Finally, with respect to dicta, I note that the Conclusion section of <u>DePrince I</u>, which summarizes the opinion's holding as to Starboard's unilateral mistake of fact defense, makes no mention of the inducement and negligence prongs. This is another indication that <u>DePrince I</u>'s elaboration of those prongs is dicta. The relevant portion of the Conclusion merely states: "There remain genuine issues of material fact to be resolved, and Starboard has not demonstrated that it is entitled to judgment as a matter of law." <u>DePrince I</u>, 153 So. 3d at 598.

35

My view of the law of the case doctrine's application is guided by the Florida Supreme Court's discussion of the doctrine in <u>Myers v. Atlantic Coast Line Railroad Company</u>, 112 So. 2d 263 (Fla. 1959) ("<u>Myers II</u>").

Susan Myers was killed when an automobile in which she was a passenger drove into an oncoming train at a Winter Park crossing. At a first trial, a jury returned a verdict against the railroad company in favor of her estate. The trial court granted the defendant railroad company's motion for new trial, determining that the evidence did not support the jury verdict for Myers. In its new trial order, the trial court determined that the sole proximate cause of the accident was the negligence of the driver. <u>Myers v. Atl. Coast Line R.R. Co.</u>, 86 So. 2d 792, 794 (Fla. 1956) ("<u>Myers I</u>").

On appeal, the Florida Supreme Court affirmed the trial court's new trial order. <u>Id.</u> at 796. Leaving little doubt as to its view of the evidence, the Court in <u>Myers I</u> stated: "The evidence in this case amply supports the court's finding that the sole proximate cause of the accident was the negligence of the driver." <u>Id.</u> at 795.

The Court unambiguously and unqualifiedly concluded its opinion as follows: "After all is said, it cannot be escaped that the sole proximate cause of the accident was driving on the tracks in front of the oncoming train without looking, listening or exercising the slightest safety precaution." <u>Id.</u> at 796.

36

On retrial, at the conclusion of all of the evidence – which was substantially similar to the evidence presented at the first trial – the trial court, in reliance on the Court's language in Myers I, applied the law of the case doctrine to direct a verdict in the railroad's favor. Myers II, 112 So. 2d at 264-65. In explaining his directed verdict to the jury, the trial court quoted, verbatim, the language cited above from Myers I. Id. at 265.

In Myers II, the Florida Supreme Court reversed the trial court's directed verdict, holding that the trial court misapplied the law of the case doctrine. Id. at 266-67. Admitting that Myers I discussed (even parroted) the trial court's finding that the automobile driver's negligence was the sole proximate cause of the accident, the Myers II Court nevertheless held: "[O]ur decision [in Myers I] turned upon a finding that the trial judge had not abused his discretion in granting a motion for a new trial. The other . . . aspects were merely ancillary and nonessential gratuitous statements designed to show why there was no abuse and, as such, were obiter dicta and not a part of 'law of the case'." Id.

I view DePrince I in very much the same way as our Supreme Court viewed its own language in Myers I. In DePrince I, with regard to the inducement and lack-of-negligence prongs of the unilateral mistake of fact defense, we included nonessential, ancillary, gratuitous language explaining our summary judgment

37

reversal. The DePrince I decision, however, turned on the insular issue then before us: whether there were genuine issues of fact precluding summary judgment.

I am not convinced that the law of the case doctrine applies beyond that insular point. Ameriseal of N.E. Fla., Inc. v. Leiffer, 738 So. 2d 993, 994 (Fla. 5th DCA 1999); Warren v. Palm Beach Cty., 528 So. 2d 413, 415-16 (Fla. 4th DCA 1988); Philip J. Padovano, 2 Florida Appellate Practice § 20.12 (2016 ed.) ("An appellate decision reversing a summary judgment is unlikely to implicate the law of the case doctrine") (footnote omitted). As this Court has expressly recognized, when we review a summary judgment, we look for whether the record conclusively establishes the absence of a genuine issue of material fact, considering only those facts that favor the non-moving party; and therefore, legal conclusions reached while conducting such a review do not establish the law of the case. Ponce Dev. Co. v. Espino, 449 So. 2d 317, 319 (Fla 3d DCA 1984) (on motion for clarification). I would not expand the law of the case doctrine in this case to incorporate DePrince I's dicta. Myers II; S.M. Crabtree v. Aetna Cas. & Sur. Co., 438 So. 2d 102, 105-06 (Fla. 1st DCA 1983).

### III. Conclusion

Jury instructions are based on facts developed throughout a case, including at trial; in other words, developed facts must support an instruction. Aubin v.

Union Carbide Corp., 177 So. 3d 489, 517 (Fla. 2015); Garrison v. Hertz Corp., 129 So. 2d 452, 453 (Fla. 3d DCA 1961).

The record in this case indicates that the trial court was keenly aware of DePrince I and strived to comply with it. When the trial court formulated its unilateral mistake of fact instruction – particularly as it defined the inducement and lack-of-negligence prongs – the trial court was responding to the evidence developed over the course of the *entire* proceedings, evidence that painstakingly showed Starboard's pricing error and Mr. DePrince's exploitation of it for gain. I would not, as the majority has done under the auspices of law of the case, engrave DePrince I's nonessential, ancillary dicta into this case so as to negate a verdict amply supported by competent, substantial evidence and rendered by a well-instructed jury.

I would affirm.