212 So.2d 906 (1968)
Audrey E. VOKES, Appellant,
v.
ARTHUR MURRAY, INC., a Corporation, J.P. Davenport, d/b/a Arthur Murray School of Dancing, Appellees.
No. 67-476.
District Court of Appeal of Florida. Second District.
July 31, 1968.
Wolfe, Bonner & Hogan, Clearwater, for appellant.
Julian R. Howay, St. Petersburg, for appellees.
PIERCE, Judge.
This is an appeal by Audrey E. Vokes, plaintiff below, from a final order dismissing with prejudice, for failure to state a cause of action, her fourth amended complaint, hereinafter referred to as plaintiff's complaint.
Defendant Arthur Murray, Inc., a corporation, authorizes the operation throughout *907 the nation of dancing schools under the name of "Arthur Murray School of Dancing" through local franchised operators, one of whom was defendant J.P. Davenport whose dancing establishment was in Clearwater.
Plaintiff Mrs. Audrey E. Vokes, a widow of 51 years and without family, had a yen to be "an accomplished dancer" with the hopes of finding "new interest in life". So, on February 10, 1961, a dubious fate, with the assist of a motivated acquaintance, procured her to attend a "dance party" at Davenport's "School of Dancing" where she whiled away the pleasant hours, sometimes in a private room, absorbing his accomplished sales technique, during which her grace and poise were elaborated upon and her rosy future as "an excellent dancer" was painted for her in vivid and glowing colors. As an incident to this interlude, he sold her eight 1/2-hour dance lessons to be utilized within one calendar month therefrom, for the sum of $14.50 cash in hand paid, obviously a baited "comeon".
Thus she embarked upon an almost endless pursuit of the terpsichorean art during which, over a period of less than sixteen months, she was sold fourteen "dance courses" totalling in the aggregate 2302 hours of dancing lessons for a total cash outlay of $31,090.45, all at Davenport's dance emporium. All of these fourteen courses were evidenced by execution of a written "Enrollment Agreement  Arthur Murray's School of Dancing" with the addendum in heavy black print, "No one will be informed that you are taking dancing lessons. Your relations with us are held in strict confidence", setting forth the number of "dancing lessons" and the "lessons in rhythm sessions" currently sold to her from time to time, and always of course accompanied by payment of cash of the realm.
These dance lesson contracts and the monetary consideration therefor of over $31,000 were procured from her by means and methods of Davenport and his associates which went beyond the unsavory, yet legally permissible, perimeter of "sales puffing" and intruded well into the forbidden area of undue influence, the suggestion of falsehood, the suppression of truth, and the free exercise of rational judgment, if what plaintiff alleged in her complaint was true. From the time of her first contact with the dancing school in February, 1961, she was influenced unwittingly by a constant and continuous barrage of flattery, false praise, excessive compliments, and panegyric encomiums, to such extent that it would be not only inequitable, but unconscionable, for a Court exercising inherent chancery power to allow such contracts to stand.
She was incessantly subjected to overreaching blandishment and cajolery. She was assured she had "grace and poise"; that she was "rapidly improving and developing in her dancing skill"; that the additional lessons would "make her a beautiful dancer, capable of dancing with the most accomplished dancers"; that she was "rapidly progressing in the development of her dancing skill and gracefulness", etc., etc. She was given "dance aptitude tests" for the ostensible purpose of "determining" the number of remaining hours instructions needed by her from time to time.
At one point she was sold 545 additional hours of dancing lessons to be entitled to award of the "Bronze Medal" signifying that she had reached "the Bronze Standard", a supposed designation of dance achievement by students of Arthur Murray, Inc.
Later she was sold an additional 926 hours in order to gain the "Silver Medal", indicating she had reached "the Silver Standard", at a cost of $12,501.35.
At one point, while she still had to her credit about 900 unused hours of instructions, she was induced to purchase an additional 24 hours of lessons to participate in a trip to Miami at her own expense, where *908 she would be "given the opportunity to dance with members of the Miami Studio".
She was induced at another point to purchase an additional 126 hours of lessons in order to be not only eligible for the Miami trip but also to become "a life member of the Arthur Murray Studio", carrying with it certain dubious emoluments, at a further cost of $1,752.30.
At another point, while she still had over 1,000 unused hours of instruction she was induced to buy 151 additional hours at a cost of $2,049.00 to be eligible for a "Student Trip to Trinidad", at her own expense as she later learned.
Also, when she still had 1100 unused hours to her credit, she was prevailed upon to purchase an additional 347 hours at a cost of $4,235.74, to qualify her to receive a "Gold Medal" for achievement, indicating she had advanced to "the Gold Standard".
On another occasion, while she still had over 1200 unused hours, she was induced to buy an additional 175 hours of instruction at a cost of $2,472.75 to be eligible "to take a trip to Mexico".
Finally, sandwiched in between other lesser sales promotions, she was influenced to buy an additional 481 hours of instruction at a cost of $6,523.81 in order to "be classified as a Gold Bar Member, the ultimate achievement of the dancing studio".
All the foregoing sales promotions, illustrative of the entire fourteen separate contracts, were procured by defendant Davenport and Arthur Murray, Inc., by false representations to her that she was improving in her dancing ability, that she had excellent potential, that she was responding to instructions in dancing grace, and that they were developing her into a beautiful dancer, whereas in truth and in fact she did not develop in her dancing ability, she had no "dance aptitude", and in fact had difficulty in "hearing the musical beat". The complaint alleged that such representations to her "were in fact false and known by the defendant to be false and contrary to the plaintiff's true ability, the truth of plaintiff's ability being fully known to the defendants, but withheld from the plaintiff for the sole and specific intent to deceive and defraud the plaintiff and to induce her in the purchasing of additional hours of dance lessons". It was averred that the lessons were sold to her "in total disregard to the true physical, rhythm, and mental ability of the plaintiff". In other words, while she first exulted that she was entering the "spring of her life", she finally was awakened to the fact there was "spring" neither in her life nor in her feet.
The complaint prayed that the Court decree the dance contracts to be null and void and to be cancelled, that an accounting be had, and judgment entered against the defendants "for that portion of the $31,090.45 not charged against specific hours of instruction given to the plaintiff". The Court held the complaint not to state a cause of action and dismissed it with prejudice. We disagree and reverse.
The material allegations of the complaint must, of course, be accepted as true for the purpose of testing its legal sufficiency. Defendants contend that contracts can only be rescinded for fraud or misrepresentation when the alleged misrepresentation is as to a material fact, rather than an opinion, prediction or expectation, and that the statements and representations set forth at length in the complaint were in the category of "trade puffing", within its legal orbit.
It is true that "generally a misrepresentation, to be actionable, must be one of fact rather than of opinion". Tonkovich v. South Florida Citrus Industries, Inc., Fla.App. 1966, 185 So.2d 710; Kutner v. Kalish, Fla.App. 1965, 173 So.2d 763. But this rule has significant qualifications, applicable here. It does not apply where there is a fiduciary relationship between the parties, or where there has been some *909 artifice or trick employed by the representor, or where the parties do not in general deal at "arm's length" as we understand the phrase, or where the representee does not have equal opportunity to become apprised of the truth or falsity of the fact represented. 14 Fla.Jur. Fraud and Deceit, § 28; Kitchen v. Long, 1914, 67 Fla. 72, 64 So. 429. As stated by Judge Allen of this Court in Ramel v. Chasebrook Construction Company, Fla.App. 1961, 135 So.2d 876:
"* * * A statement of a party having * * * superior knowledge may be regarded as a statement of fact although it would be considered as opinion if the parties were dealing on equal terms."
It could be reasonably supposed here that defendants had "superior knowledge" as to whether plaintiff had "dance potential" and as to whether she was noticeably improving in the art of terpsichore. And it would be a reasonable inference from the undenied averments of the complaint that the flowery eulogiums heaped upon her by defendants as a prelude to her contracting for 1944 additional hours of instruction in order to attain the rank of the Bronze Standard, thence to the bracket of the Silver Standard, thence to the class of the Gold Bar Standard, and finally to the crowning plateau of a Life Member of the Studio, proceeded as much or more from the urge to "ring the cash register" as from any honest or realistic appraisal of her dancing prowess or a factual representation of her progress.
Even in contractual situations where a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, the law is if he undertakes to do so he must disclose the whole truth. Ramel v. Chasebrook Construction Company, supra; Beagle v. Bagwell, Fla.App. 1964, 169 So.2d 43. From the face of the complaint, it should have been reasonably apparent to defendants that her vast outlay of cash for the many hundreds of additional hours of instruction was not justified by her slow and awkward progress, which she would have been made well aware of if they had spoken the "whole truth".
In Hirschman v. Hodges, etc., 1910, 59 Fla. 517, 51 So. 550, it was said that 
"* * * what is plainly injurious to good faith ought to be considered as a fraud sufficient to impeach a contract",
and that an improvident agreement may be avoided 
"* * * because of surprise, or mistake, want of freedom, undue influence, the suggestion of falsehood, or the suppression of truth". (Emphasis supplied.)
We repeat that where parties are dealing on a contractual basis at arm's length with no inequities or inherently unfair practices employed, the Courts will in general "leave the parties where they find themselves". But in the case sub judice, from the allegations of the unanswered complaint, we cannot say that enough of the accompanying ingredients, as mentioned in the foregoing authorities, were not present which otherwise would have barred the equitable arm of the Court to her. In our view, from the showing made in her complaint, plaintiff is entitled to her day in Court.
It accordingly follows that the order dismissing plaintiff's last amended complaint with prejudice should be and is reversed.
Reversed.
LILES, C.J., and MANN, J., concur.