**BAL–FEL, INC., Appellant,**

v.

**Mrs. John P. BOYD, Appellee.**

**No. 12061.**

Court of Civil Appeals of Texas, Austin.

Dec. 12, 1973.

Gordon MacDowell, Dallas, for appellant.

Robert C. Duke, Austin, for appellee.

O'QUINN, Justice.

This appeal is from order of the trial court overruling appellant's plea of privilege to compel trial in Dallas County of a cause appellee brought in Travis County.

Mrs. John P. Boyd, a widow residing in Travis County, brought an action in July of 1971 alleging damages of $32,000 growing out of alleged fraudulent conduct of the several defendants, some of whom were residents of Travis County.

Plaintiff named as individual defendants Richard Felix, John Felix, Jr., and Paul D. Pierce, all residents of Travis County. Plaintiff also sued R & J, Incorporated, doing business as Fred Astaire Dance Studios, a Texas corporation with offices at 1500 West 34th Street in Austin, Travis County.

Plaintiff sued appellant, Bal-Fel, Incorporated, a Texas corporation, as the licensor of R & J, Incorporated, alleging that Nickolas Felix, at 6131 Luther Lane in Dallas, is the agent for service of Bal-Fel.

Plaintiff sued National Dance Association, Incorporated, as the national regulatory entity governing local Fred Astaire Dance Studios, alleging that it is a Florida corporation with home offices in Suite 208, 11205 South Dixie Highway, Miami, Florida, and sought service of process through the Secretary of State of Texas.

Bal-Fel, Inc., filed its plea of privilege to be sued in Dallas County, the county of its domicile. The appellee, plaintiff below, filed her controverting affidavit contending that venue in Travis County should be maintained under Section 4 of Article 1995 which provides in pertinent part:

"4. Defendants in different counties.— If two or more defendants reside in differ-

ent counties, suit may be brought in any county where one of the defendants resides. * * *" (sec. 4, Art. 1995, Vernon's Ann.Texas St.)

The trial court overruled the plea of privilege, and Bal-Fel, Inc., appeals from that judgment. We will affirm judgment of the trial court.

The venue facts to be established under Section 4 are: (a) one defendant resides in the county of suit; (b) the party asserting his privilege is at least a proper party to the suit against the resident defendant; and (c) the plaintiff has a *bona fide* claim against the resident defendant. Hoover v. Barker, 476 S.W.2d 126, 128 (Tex.Civ.App., Austin 1972, writ dsmd.); Stockyards National Bank v. Maples, 127 Tex. 633, 95 S.W.2d 1300 (1936); 1 McDonald, Texas Civil Practice, Venue Sec. 4.10.2, p. 434 (1965 Rev.Ed.).

It appears conceded on appeal that plaintiff below met the burden of proof that at least one defendant resided in Travis County and that appellant was a proper party to the suit against the resident defendant.

The sole issue remaining is whether appellee pleaded and proved by a preponderance of the evidence each element of a *bona fide* claim against the resident defendant, which was same claim asserted against the defendant in the controverting affidavit. 1 McDonald, Texas Civil Practice, Sec. 4.10.2, p. 441 (1965 Rev.Ed.); Gray v. Gulf Oil Corporation, 416 S.W.2d 875, 877 (Tex.Civ.App., Fort Worth 1967, no writ).

Testimony adduced at the hearing on the plea of privilege, bearing upon the elements of appellee's cause, we set out here in brief.

Appellee was a widow, aged 56, when in March of 1970 as the guest of a friend she visited the Fred Astaire Dance Studios in Austin, where she was asked to enroll for an introductory course of five dance les-

sons at a charge of five dollars for the course. After completing three lessons appellee was asked to enroll in a larger program. During these early lessons appellee was "made over . . . [and] flattered" by the male personnel of the studio who told her that she "had the potential to be a great dancer." It was learned also in this period that appellee was a widow whose husband had been dead less than three years.

Appellee testified that she was lonely and "had not been out, at all, since . . ." her husband's death and "was wanting to meet friends and to be in a social climate." Appellee admitted that she "was real anxious for the flattery and involvement that . . . [she] would get there at the studio." In this brief period, appellee said, " . . . they flattered me and played upon my emotions as a lonely widow to take more dance lessons."

Responding to the coaxing and blandishments of the men at the studio, appellee on March 19, 1970, signed an agreement to take 45 dance lessons, for which she paid the Fred Astaire Studio $364.50 in advance. Fifteen of the lessons were to be private, fifteen were "class" lessons, and the remaining fifteen were to be "practice" lessons. This contract was but the first of a series of contracts, made in rapid succession over a period of months, with the numbers of the lessons increasing to a total approaching 2,500 and their costs ascending to an aggregate in excess of $27,000 before the end of the year.

After completing about ten of the first set of forty-five dance lessons, appellee was induced by the operators of the studio to contract, early in April, for 191 additional lessons at a cost of $1,750. This program was divided into 91 private lessons, 50 class lessons, and 50 practice lessons, which the studio called the "Amalgamated Program of Dancing." Appellee paid for this series in advance from her bank account which contained the life in-

surance money left appellee by her deceased husband.

Within less than two weeks after entering the "Amalgamated Program of Dancing," appellee was persuaded to enter another program at the studio, a program of 508 lessons costing $4,450. Appellee testified that after buying the "Amalgamated Program" she acquired a status at the studio in which, she said, " . . . they were very nice to me, flattering, and they would embrace me when I would come in. They were always glad to see me, and I felt like I was in a happy, lovable atmosphere, and they knew that I was lonely, and they would make me feel welcome."

The contract appellee made for the new program, dated April 23, was marked "Confidential" by the studio and designated the "Supreme Gold Dance Standard." Appellee testified that the term "Confidential" as applied to the contract " . . . meant that it was loaned to me by the studio, and I wasn't supposed to tell anyone that, but then I was asked right away to pay the money because they needed it, so I paid in one check."

Appellee did not have funds remaining in her bank account sufficient to pay the $4,450 and was obliged to borrow the money. Appellee, a school teacher, borrowed the $4,450 from the credit union in which she had membership as a teacher. Appellee borrowed the money on April 29, and paid the studio, six days after entering the "Supreme Gold Dance Standard" contract.

In the month of June appellee yielded to further persuasion by the men at the studio and entered into two contracts, on June 12 and on June 15, for a total of 1,068 dance lessons at an aggregate cost of $9,612. Appellee paid this contract in advance by two checks in amounts of $6,260 and $3,352, the first for dance lessons in the "Gold Cane Club" and the other in "Theater Arts Club."

Early in September appellee was induced to enter two additional clubs offered by the studio which were designated the "Single Mingle Club" and the "Fiesta Dance Clubs," at a total cost of $1,400. Initially, appellee agreed to pay $200 down and the balance of $1,200 in ten monthly payments of $120 each. This contract obligation was discharged subsequently in full.

Prior to making the September contracts, appellee in August sold her home; from which sale she realized about $17,000 above indebtedness, in order to buy stock in the dance studio. Appellee testified, " . . . I was told that the stock was very good, and that since I was dancing there that I would want to own stock in the Studio, and therefore, derive benefits from the other people who came to take dancing, so I was asked if I would buy some stock." The solicitations were confidential, appellee said, " . . . and we were taken into little offices to do that [buy stock] confidentially, and just two members of the staff are there, but no one else. They would tell me that, 'We are not going to sell it to just anybody, but you are one of our favorites, so we want to give you a chance to make some money.'"

Appellee wrote a check on August 31 in the sum of $10,000 to buy the stock. Later, in December, after being persuaded to join the "Executive Competition Club" at an additional cost of $9,418, appellee turned the stock "back over to them in exchange for the Executive Competition Club" in which she was scheduled to receive 626 additional hours of dance lessons. Appellee testified that she " . . . was told that the stock could be turned into the Executive Competition Club because . . . I would derive more benefits from it . . . than the stock, because the stock . . . wasn't paying any dividends. Nobody was getting anything from the stock, anyway."

When induced in December to join the "Executive Competition Club," appellee was told by an operator at the studio, she testified, "It was a club that just his very best dancers were to join, and we were to

be in competition with dancers all over the United States, and even internationally; eventually in Japan, to go to Japan. It was a very elite club." Appellee was already at that time making short trips with other dancers from Austin to enter competition against clubs in other cities, for which she paid the studio $60 per trip plus expenses.

Appellee testified that between March 18, 1970, and the end of that year, in a series of five contracts, she bought 2,438 hours of dancing lessons, and that these purchases, together with cost of joining the "Single Mingle Club" and the "Fiesta Dance Clubs," she paid the Fred Astaire Dance Studios more than $27,000 in cash.

When asked at the hearing on the plea of privilege why she made these payments, appellee testified, "I was lonely. My husband had passed away. I had no social life, and when I went to this Studio, they were very friendly and loving, and in an intimate atmosphere, they would tell me, 'You want to be a great dancer? You are going to be the best . . .' and they would flatter me and play upon my emotional status as a lonely widow to induce me to buy more lessons, and I kept getting in deeper, and I thought, 'Well what is the use? I am just getting in where I can't get out, looks like,' so I decided I just had to stop."

It was with this decision that appellee sought legal advice, after which this lawsuit was filed when the studio refused to refund the money appellee had paid.

■ From examination of the record we conclude that appellee made proof of a *bona fide* claim against the resident individual defendants and against the resident corporate defendant acting through its officers and agents. The trial court made no findings of facts or conclusions of law and none was requested. On appeal the reviewing court must presume that the trial court resolved all issuable facts in such way as to support the judgment, and if there is competent testimony to support the

judgment, the judgment must be sustained. In short, the appellate court will review the fact findings as in any other case on appeal. Compton v. Elliott, 126 Tex. 232, 88 S.W.2d 91, 95 (1935); Monroe v. Mercer, 414 S.W.2d 756, 761 (Tex.Civ.App., Houston 1967, writ dismd.).

■■ Appellee as plaintiff below pleaded several theories of recovery in the alternative. We confine our decision to pleadings and proof pertaining to fraudulent conduct of the resident defendants. In the making of a contract if fraudulent representations or fraudulent concealment of material facts constitute the inducement to the making of the contract, a case of manifest fraud exists, and "fraud vitiates every contract, and may consist either in misrepresentation or in concealment." Wintz v. Morrison, 17 Tex. 372, 383–384 (1856); Bondies v. Glenn, 119 S.W.2d 1095, 1098 (Tex.Civ.App., Eastland 1938, writ dismd.); Glens Falls Insurance Co. v. State National Bank of El Paso, 475 S.W. 2d 386, 389 (Tex.Civ.App., El Paso 1972, writ ref. n. r. e.); Pierson v. Holligan, 497 S.W.2d 637, 639 (Tex.Civ.App. Waco 1973, writ dismd. w. o. j.).

■ In this case it was shown that defendants created and operated in a confidential relationship with appellee. This Court in an earlier case has examined and stated the case law under which a confidential relationship may exist between contracting persons. See Tuck v. Miller, 483 S.W.2d 898, 906 (Tex.Civ.App., Austin 1972, writ ref. n. r. e.). In representing to appellee, a woman 56 years old, that this school teacher could complete nearly 2,500 dancing lessons and thereby become "a great dancer," capable of professional performance in international competition, is conduct manifestly deceptive and fraudulent. It is obvious from the record that the purpose of such fantastic representations was to obtain substantial sums of money from appellee, a design that yielded more than $27,000 in less than nine months.

But for the fact that appellee was cautious and unpersuaded at one stage of the studied treatment she received from defendants, appellee perhaps would have lost her home and remained in debt to the credit union from which she had borrowed money to buy the first contracts with defendants. The defendants urged appellee to permit them to sell her home for her and to allow defendants to keep all proceeds above the debt on the home. Instead, appellee sold her home and, after paying her debt to the credit union, amounting to about $7,800, she bought $10,000 of stock in the Fred Astaire Dance Studio. The sale of the stock was a confidential transaction, by arrangement of the defendants.

Defendants insisted the stock was valuable. They told appellee, "We are not going to sell it to just anybody, but you are one of our favorites, so we want to give you a chance to make some money." A few weeks later the defendants induced appellee to turn the $10,000 in stock into membership in the "Executive Competition Club," offering some 628 additional dancing lessons, and explained to appellee that the stock was not paying dividends and that nobody was getting anything from the stock.

Our examination of decisions appearing in the national reporter system discloses that suits of this nature, in which dance studios have induced persons to buy hundreds of hours of dancing lessons for sums amounting to thousands of dollars, are not uncommon. In only one jurisdiction, California, have the courts held the studio operators under provisions of a statute. In the other states the conduct of the studio operators has been dealt with without the aid of statutory precepts and entirely upon rules of common law as applied under case law.

Among the California cases, decided under statute (Title 2.5 of the Civil Code,

secs. 1812.80 et seq.), are People v. Arthur Murray, Inc., 238 Cal.App.2d 333, 47 Cal. Rptr. 700 (1965); Holland v. Nelson and Arthur Murray, Inc., 5 Cal.App.3d 308, 85 Cal.Rptr. 117 (1970).

A Florida decision under facts similar to the facts of the case at bar is Vokes v. Arthur Murray, Inc., Fla.App., 212 So.2d 906. In that case the complaining party was a woman 51 years of age who had been induced to contract for 2,302 hours of dancing lessons for a total cash outlay of more than $31,000. This case is reported and annotated in 28 A.L.R.3d 1405, 1412 (1969).

Appellee pleaded and on appeal argues that her contracts with defendants were unconscionable under Title 1, sec. 2.302 V. T.C.A. of the Texas Business and Commerce Code (Uniform Commercial Code, sec. 2.302). We find no Texas decisions construing this section under facts resembling the present case, and in view of our disposition on other grounds we will not reach this contention. We observe, however, that in at least two jurisdictions, New York and New Jersey, courts have sustained contentions under this section that contracts were unconscionable. In New Jersey the purchase of a deep freezer for $1,092 was held to be an unconscionable contract when it was shown the freezer had a reasonable value of $300. Toker v. Perl, 103 N.J.Super. 500, 247 A.2d 701 (1968), affirmed, 108 N.J.Super. 129, 260 A.2d 244 (1970). The purchase of 500 hours of computer programming lessons for $2,400 was held by a New York court to violate the uniform code section (2.302) under the facts of that case. Educational Beneficial, Inc. v. Reynolds, 67 Misc.2d 739, 324 N.Y.S.2d 813 (1971).

The judgment of the trial court overruling the plea of privilege of Bal-Fel, Inc., is affirmed.

Affirmed.