NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

CHARLES W. GRIMES and BRENDA          )
GRIMES,                               )
                                      )
            Appellants,               )
                                      )
v.                                    )          Case No. 2D16-5557
                                      )
KEVIN R. LOTTES; ANTHONY F.           )
ROMANO; and DEBRA B. ROMANO,          )
                                      )
            Appellees.                )
_____ )

Opinion filed February 9, 2018.

Appeal from the Circuit Court for Collier
County; Lauren L. Brodie, Judge.

Chris W. Altenbernd of Carlton Fields
Jorden Burt, P.A., Tampa; Chris W.
Altenbernd of Banker Lopez Gassler P.A.,
Tampa (substituted as counsel of record)
for Appellants.

Mark H. Muller of Mark H. Muller, P.A.,
Naples, for Appellee Kevin R. Lottes.

No appearance for remaining Appellees.


BLACK, Judge.

Charles and Brenda Grimes challenge the final summary judgment entered in favor of Kevin Lottes, a board-certified real estate attorney who was retained by Anthony and Debra Romano to represent them in the purchase of the Grimeses' home. Because genuine issues of material fact remain in dispute with regard to whether Mr. Lottes committed either a fraudulent or negligent misrepresentation or a fraudulent or negligent concealment by falsely assuring Mrs. Grimes, who was also the listing real estate agent, that no buyer's-side real estate broker commission would be payable in the transaction, we reverse.

While looking for a home in the Naples area in 2014, Mr. Romano located the Grimeses' home through an online search. The home was listed with Premier Sotheby's International Realty (Sotheby's), and after reviewing Sotheby's website and other online sources, Mr. Romano learned that Mrs. Grimes, a Sotheby's agent, was both the listing agent and the homeowner. So on January 15, 2015, Mr. Romano sent a message to Mrs. Grimes using the electronic form on Sotheby's website asking to see the home. But Mrs. Grimes was a new agent with Sotheby's and had not been trained on Sotheby's message routing system—a prerequisite to receiving messages—so Mr. Romano's message was not routed to her. Instead Mr. Romano's message was routed to other Sotheby's agents as a "lead" until it was ultimately accepted by Robert Hall. Mr. Hall called Mr. Romano and informed him that he worked for Sotheby's and agreed to set up a viewing of the Grimeses' home. Mr. Hall then contacted Mrs. Grimes and arranged for the showing. Although Mrs. Grimes and Mr. Hall both worked for Sotheby's, they had never met.

In preparation for the showing, Mr. Hall researched the Grimeses' home and neighborhood; he also researched other homes that might interest the Romanos. He spoke with Mr. Romano on the phone several times before the showing and sent Mr. Romano an email with several other potential listings. Mr. Hall was also in contact with Mrs. Grimes before the showing and learned that she was not only the listing agent but also the homeowner.

The Romanos met Mr. Hall at the Grimeses' home on January 23, and Mr. Hall presented them with a packet of information about the home. Mr. Hall introduced the Romanos to Mrs. Grimes as his clients and provided everyone with his business card. After guiding the Romanos and Mr. Hall on a thorough tour of her home, lasting thirty to forty minutes, Mrs. Grimes excused herself and allowed the group to continue viewing the home at their leisure. After Mr. Hall and the Romanos departed, Mrs. Grimes called Mr. Hall requesting feedback on the showing. Mr. Hall agreed to keep her informed if the Romanos had interest in the home; the two had no further contact until after the litigation began.

Mr. Hall called Mr. Romano multiple times after the showing and offered to put a contract together. Mr. Romano declined Mr. Hall's offer, and ultimately, on February 8, Mr. Romano informed Mr. Hall that his services would not be needed. During this same time frame, Mr. Romano retained Mr. Lottes in order to obtain a legal opinion as to whether the work Mr. Hall did in arranging the home visit and conducting the related research would constitute a "procuring cause" such that Mr. Hall might be entitled to a commission. Based on Mr. Romano's representations to Mr. Lottes regarding Mr. Hall's involvement, Mr. Lottes opined that Mr. Hall would not be entitled to

- 3 -

a commission. In an email to Mr. Lottes dated February 7, Mr. Romano requested that Mr. Lottes contact Mrs. Grimes on behalf of him and his wife with an offer to purchase her home with Mr. Lottes' assurances that there would be no buyer's-side commission. Mr. Romano's email provides, in part:

> Because there is a significant variance between the asking price and our offer and because we have no agent to manage the dialogue or negotiations, I would like it to be clear in the offer that I would be happy to talk with the owner directly about the "logic" behind our offer as well as any counteroffer.
>
> In addition, as we discussed on the phone, I would like to use the language you suggested with regard to the fact that there will be no buyer[']s realty commissions and that we would expect that amount to be reflected in any agreement.

Two days later, Mr. Lottes sent the email that forms the crux of this case to Mrs. Grimes:

> I represent Mr. Anthony F. Romano and his wife, Debra B. Romano, as their attorney in connection with the Romanos' attached Buyer-executed offer to purchase the above referenced property of which you are the owner and the listing agent. Please review the attached cash offer and, if it is acceptable, execute it where indicated on Page 10 and return it to me via fax or scanned e-mail.
>
> Please note that the Romanos are not represented by any real estate broker in connection with the offer and/or their effort to purchase your property and, as a result, the purchase price reflected in their attached offer takes into account the fact that there would be no "Buyer's-side" or "Selling-side" co-brokerage commission payable in connection with this transaction.
>
> In addition, please note that the Romanos are somewhat flexible as to the closing date and that, as a result, if a different closing date other than the April 28, 2015 if [sic] preferred by you, please let us know. Also, please note that, to the extent that there would be some specified exclusions concerning furnishings, personal property and the

- 4 -

> like (as referenced in Contract Lines 5-6), please let us know.
>
> Finally, to the extent that you have questions or would like to discuss the Romanos' offer directly with Mr. Romano, he would welcome such direct communication with you . . . . Of course, if you wish to contact me, my contact information is listed below.

In the sales contract attached to Mr. Lottes' email the word "none" had been filled in in the space designated for identifying the buyer's-side broker. Mrs. Grimes believed that the initial offer was too low, so she and Mr. Romano communicated over the phone and via email for several days before finally agreeing on a price. Mr. Romano requested that Mrs. Grimes make the necessary changes to the proposed contract prepared by Mr. Lottes. The signed contract provided that there was no buyer's-side broker. Mrs. Grimes also added a claim to the terms and conditions of the contract clarifying that Sotheby's was to receive a total commission of $6310, which reflected the special discount Mrs. Grimes was entitled to as a Sotheby's agent and nothing more, in apparent reliance on Mr. Lottes' email. Two days after the contract was signed, Mrs. Grimes became suspicious about the manner in which Mr. Romano came to see her house. Up to that point, Mrs. Grimes believed that Mr. Romano was the "nice man" who had come to one of her open houses. Mr. Romano admitted that he had seen her home with Mr. Hall. Thereafter, the Grimeses declared the contract to be terminated.

On March 12, 2015, the Romanos filed suit against the Grimeses for breach and anticipatory breach of the real estate contract, requesting specific performance. In turn, the Grimeses filed a counterclaim against the Romanos and a third-party complaint against Mr. Lottes. Mr. Lottes moved for summary judgment, and the motion was granted. The operative counts of the second amended counterclaim

and third-party complaint are as follows: fraudulent misrepresentation (count eight), fraudulent concealment (count nine), negligent misrepresentation (count ten), and negligent concealment (count eleven).  The court's explanation for its determination on summary judgment was minimal: Mr. Lottes was entitled to summary judgment because there are no genuine issues of material fact with regard to the four claims raised by the Grimeses and the sales contract is clear and unambiguous.  The Grimeses' motion for rehearing and clarification was denied.  On appeal, the Grimeses assert that Mr. Lottes' statement regarding the buyer's-side commission was one of fact and not a mere legal opinion and is thus actionable in fraud.  The Grimeses further argue that material facts remain in dispute precluding summary judgment.

"If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it."  Moore v. Morris, 475 So. 2d 666, 668 (Fla. 1985) (first citing Williams v. Lake City, 62 So. 2d 732, 733 (Fla. 1953); and then citing Crovella v. Cochrane, 102 So. 2d 307, 310 (Fla. 1st DCA 1958)).

"[T]here are four elements of fraudulent misrepresentation: '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in *reliance* on the representation.' "  Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010) (quoting Johnson v. Davis, 480 So. 2d 625, 627 (Fla. 1985)).  "[F]raud is not ordinarily a suitable subject for summary judgment."  Richards v. Wax, 511 So. 2d 433, 434 (Fla. 2d DCA 1987) (alteration in original) (quoting Levey v. Getelman, 408 So. 2d 663, 665 (Fla. 3d DCA 1981)).  "[I]t is a

- 6 -

subtle thing requiring a full explanation of the facts and circumstances of the alleged wrong to determine if they collectively constitute a fraud." Id. (alteration in original) (quoting Amazon v. Davidson, 390 So. 2d 383, 385 (Fla. 5th DCA 1980)). The requirements to establish negligent misrepresentation are similar to those required to establish fraudulent misrepresentation, with the exception that the knowledge element requires only that "the representer either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false." Baggett v. Electricians Local 915 Credit Union, 620 So. 2d 784, 786 (Fla. 2d DCA 1993) (citing Atl. Nat'l Bank of Fla. v. Vest, 480 So. 2d 1328, 1331 (Fla. 2d DCA 1985)).

Importantly, "[a] claim for fraudulent misrepresentation is not actionable if premised on a mere opinion, rather than a material fact." Thor Bear, Inc. v. Crocker Mizner Park, Inc., 648 So. 2d 168, 172 (Fla. 4th DCA 1994) (citing Chino Elec., Inc. v. U.S. Fidelity & Guar. Co., 578 So. 2d 320, 323 (Fla. 3d DCA 1991)). The threshold determination regarding whether the representation is a fact or an opinion requires consideration of the surrounding circumstances. See Tres-AAA-Exxon v. City First Mortg., Inc., 870 So. 2d 905, 907 (Fla. 4th DCA 2004). Where the representation "can be viewed as coming from one with superior knowledge of the subject of the statement," the representation should be treated as a fact. Thor Bear, 648 So. 2d at 172 (first citing A.S.J. Drugs, Inc. v. Berkowitz, 459 So. 2d 348, 350 (Fla. 4th DCA 1984); then citing Amazon, 390 So. 2d at 386; and then citing Ramel v. Chasebrook Constr. Co., 135 So. 2d 876, 881-82 (Fla. 2d DCA 1961)).

It is not clear whether the trial court determined that Mr. Lottes' statement was one of opinion and thus could not form the basis of a misrepresentation claim or whether the trial court determined that Mr. Lottes' statement was actionable as an assertion of fact but that Mr. Lottes was nonetheless entitled to summary judgment on the Grimeses' claims of fraud and negligence.  But either way, the court erred.  Given Mr. Lottes' competency and experience as a board-certified real estate attorney and his unambiguous email to Mrs. Grimes stating that the offer takes into account "the fact" that there would be no the buyer's-side commission, his statement could certainly be viewed as a fact.  See Thor Bear, 648 So. 2d at 172 (holding that landlord had "superior knowledge" of the parking facilities of the shopping complex such that her statements that the complex could accommodate the tenant's parking needs "should be treated as factual assertions," particularly since "her statements were not equivocal"); cf. Wasser v. Sasoni, 652 So. 2d 411, 412 (Fla. 3d DCA 1995) (holding that the sellers' statements to the buyer that the apartment building was "a very good building" requiring "normal type of maintenance" and "an excellent deal" were statements of opinion).  And because a jury could have found—if given the opportunity—that Mr. Lottes' statement was one of fact, see Atl. Nat'l Bank of Fla., 480 So. 2d at 1332 n.3, additional factual determinations must be made with regard to whether Mr. Lottes knew or should have known that his representation about the commission was false, whether Mr. Lottes intended to induce Mrs. Grimes to enter into a contract with Mr. Romano based on this representation, and whether it was appropriate for Mrs. Grimes to rely upon Mr. Lottes' representation.  See D & M Jupiter, Inc. v. Friedopfer, 853 So. 2d 485, 487 (Fla. 4th DCA 2003) (holding that since the seller's statement in the confidential offering

- 8 -

memorandum that the "[s]ite drain requirements are met"—a statement made to address concerns about the property's propensity to flood—could form the basis of a misrepresentation, summary judgment was not warranted where multiple issues of fact had yet to be resolved); Baker v. United Servs. Auto. Ass'n, 661 So. 2d 128, 132 (Fla. 1st DCA 1995) (holding that because the insurance agent's statement regarding the extent of the uninsured motorists coverage *could* be viewed as an assertion of fact under the circumstances of the case, this threshold determination of fact must be submitted to a jury as must questions regarding the agent's knowledge, the agent's intent to induce the insured's reliance, the insured's right to rely on the statement, and whether the insured did rely on the statement to his detriment); see also Bowman v. Barker, 172 So. 3d 1013, 1017 (Fla. 1st DCA 2015) (holding that material issues of fact remained in dispute regarding knowledge and intent thus precluding summary judgment). Furthermore, Mr. Hall and Mrs. Grimes both worked for Sotheby's and as a matter of policy, commission disputes between agents are handled through an internal procedure—something that Mr. Lottes likely should have known if he was aware of Mr. Hall's status as a Sotheby's agent given Mr. Lottes' experience in the field.[1]

Likewise, material facts remain in dispute with regard to whether Mr. Lottes acted intentionally or negligently in failing to disclose the extent of Mr. Hall's involvement in the real estate transaction. See Gutter v. Walker, 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994) ("A [person's] knowing concealment or nondisclosure of a material fact may also support an action for fraud where there is a duty to disclose."). Here it

---

[1]We note that both Mr. Hall's broker and Mrs. Grimes' broker, who is the CEO of Sotheby's, are of the impression that Mr. Hall is owed a commission.

remains in dispute whether Mr. Lottes owed a duty of disclosure to Mrs. Grimes given the nature of their interaction with regard to the real estate transaction. See Ramel, 135 So. 2d at 882. Moreover, even if Mr. Lottes owed no duty of disclosure to Mrs. Grimes, his partial disclosure—that there would be no buyer's-side commission required—may have triggered a duty to disclose all of the facts surrounding the situation with regard to Mr. Hall's involvement. See Vokes v. Arthur Murray, Inc., 212 So. 2d 906, 909 (Fla. 2d DCA 1968).

Mr. Lottes makes little effort on appeal to dispute the Grimeses' assertions that material facts remain in dispute with regard to their claims of fraud and negligence. Instead, he primarily argues that the issues presented by the Grimeses on appeal are not the same as those presented below. We disagree. We also disagree with Mr. Lottes' assertion that the Grimeses' claims cannot stand because Mrs. Grimes was present when Mr. Hall brought the Romanos to her house for the showing. Mrs. Grimes remembered that Mr. Hall brought a person or persons to see her house, but she did not recall who that person or persons were. As such, whether or not she relied upon Mr. Lottes' representation to her detriment remains, at a minimum, in dispute.

We review an order granting final summary judgment de novo, Damianakis v. Philip Morris USA Inc., 155 So. 3d 453, 461 (Fla. 2d DCA 2015), and "[i]f the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, the summary judgment is improper," C & J Sapp Publ'g Co. v. Tandy Corp., 585 So. 2d 290, 292 (Fla. 2d DCA 1991) (citing Young v. Johnson, 538 So. 2d 1387, 1388 (Fla. 2d DCA 1989)). See also Baker, 661 So. 2d at 132 ("Even where the facts are undisputed,

issues as to the interpretation of such facts may be such as to preclude summary judgment." (citing <u>Franklin County v. Leisure Props., Ltd.</u>, 430 So. 2d 475, 479 (Fla. 1st DCA 1983))).  Because the facts of this case are not "so crystallized" such that nothing remains but questions of law, we reverse and remand for further proceedings.  <u>See</u> <u>Ventana Condo. Ass'n, Inc. v. Chancey Design P'ship, Inc.</u>, 203 So. 3d 175, 183 (Fla. 2d DCA 2016) (quoting <u>McCabe v. Fla. Power & Light Co.</u>, 68 So. 3d 995, 997 (Fla. 4th DCA 2011)).

Reversed and remanded.

NORTHCUTT and MORRIS, JJ., Concur.