[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13110
Non-Argument Calendar
_____

D.C. Docket No. 8:14-cv-02975-RAL-MAP

ADAM R. WHITE,
JAMES NEWELL WHITE, III,

                                        Plaintiffs - Counter Defendants -
                                        Appellees,

versus

GRANT MASON HOLDINGS, INC.,
a Delaware corporation, et al.,

                                        Defendants - Counter Claimants,

PAUL FREEMAN,
an individual,

                                        Defendant - Counter Claimant -
                                        Appellant.
_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(July 6, 2018)

Before MARTIN, JULIE CARNES, and HULL, Circuit Judges.

PER CURIAM:

A jury found Paul Freeman liable on civil claims of fraudulent misrepresentation and deceptive trade practices. He now appeals the district court's denial of his motion for judgment as a matter of law or, in the alternative, for a new trial. He also challenges the damage amount awarded by the jury.

## I.  BACKGROUND

Plaintiffs Adam R. White and James Newell White, III owned Ideagear, LLC, a printing company. The Whites were approached by Darryl Mayfield, who told them that Grant Mason, LLC and Grant Mason Holdings, Inc. (collectively, "Grant Mason") had a $20 million book of business from government contracts and was looking to acquire print companies to handle that business. Mayfield proposed that Grant Mason could buy Ideagear. The Whites met with Grant Mason officers, including Darryl Mayfield, Grant Mayfield, Randall Pike, and Hung Nguyen, to negotiate the sale.

On April 24, 2014, the Whites signed a letter of intent to sell Ideagear to Grant Mason. On that day they asked for references who had previously sold companies to Grant Mason. Pike referred them to Nguyen, who had sold a software company to Grant Mason, and to Freeman, who had sold his company—

2

Midwest Mail House—to Grant Mason.  In late April, James White spoke with

Freeman over the phone, and he testified to the following conversation:

> [Freeman] confirmed that he had sold his company and confirmed some of the things that were explained to me about who Grant Mason Holdings was, that they had this book of business and that they had acquired multiple companies and they were trying to acquire more companies.
>
> He explained the process as being what I felt was pretty typical. For him, you know, in the beginning it was a little bit rocky.  The negotiations were rough, but Darryl is a pushy guy.  All of the things I had been through and experienced, and we had I think a very casual and comfortable conversation.
>
> He told me that he was going to pursue his business brokerage and get out of the direct mail business that he had been in for some time, and he was grateful that he had sold his company.
>
> In the beginning, getting the first payments was tough and the conversations were tough, but it's all smoothed out now and that he's glad that he had sold to Darryl Mayfield.

The Whites believed that Freeman was independent from Grant Mason.  At

the time he spoke to the Whites, however, Freeman owned a 10% share in Grant

Mason Holdings and was its chief operating officer ("COO").  Unbeknownst to

them, he had also supplied Darryl Mayfield with the letter of intent that Ideagear

executed with Grant Mason and which outlined the proposed transaction.  Freeman

did not tell the Whites that Grant Mason defaulted on its obligations when buying

other companies, nor that he had played a role in previous failed transactions,

including Grant Mason's troubled acquisition of Pelco Press, Inc.

3

On June 7, 2014, the parties completed the sale of Ideagear to Grant Mason, LLC. James White testified they would not have closed the deal with Grant Mason without receiving a positive independent reference from Freeman.

The parties agreed on a purchase price of $1.7 million. While Grant Mason, LLC obtained the ownership interest in Ideagear and promised to pay the Whites, both Grant Mason, LLC and Grant Mason Holdings issued promissory notes to cover the purchase price. Specifically, Grant Mason, LLC and Grant Mason Holdings issued joint promissory notes in the amount of $362,500 each to Adam and James White—to be paid in monthly installments for a year—and promised to deliver $37,500 in cash to each at closing. The deal also specified that the Whites would remain the directors of marketing and business development at Ideagear, for an agreed upon annual salary of $104,000.

After closing, Grant Mason failed to make any payments on the promissory notes. The Whites also did not receive the salaries outlined in the agreements. Grant Mason officers took out loans in Ideagear's name and did not pay the money back. Grant Mason failed to pay Ideagear suppliers, thus ruining certain business relationships the Whites had built. The Whites also had to pay the balance on a previous loan from Regions Bank that Grant Mason was supposed to have paid.

The Whites sued Grant Mason, the Mayfields, Freeman, Pike, and Nguyen, as well as other people and businesses associated with Grant Mason. With respect

4

to Freeman, they alleged three federal RICO claims under 18 U.S.C. § 1962(c) and state-law claims for fraudulent misrepresentation, unjust enrichment, conversion, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

On October 20, 2016, defendants Randal Pike and Jessica Pike alerted the district court of their pending bankruptcy, and the court stayed all proceedings relating to the Pikes in light of bankruptcy's automatic stay provision. Later, the district court entered default judgment against the corporate defendants when their counsel withdrew and they failed to obtain new counsel. The case proceeded to trial against the individual defendants—Freeman, the Mayfields, and Nguyen—and for a determination of damages owed by the corporate defendants.

The trial began on March 13, 2017. After the plaintiffs presented their case, Freeman made an oral motion for judgment as a matter of law. The district court granted the motion with regard to the unjust enrichment and conversion claims. On March 15, the jury found Freeman and the Mayfields liable on the fraudulent misrepresentation and FDUTPA claims, but found Freeman not liable on the remaining claims. The jury awarded the Whites $2,000,000 in damages on the fraudulent misrepresentation claim and $500,000 in damages on the FDUTPA claim.

On April 11, the district court entered a final judgment consistent with the jury verdict. To avoid a duplicate recovery, the court ordered Grant Mason, the Mayfields, and Freeman jointly liable for a total amount of $2,000,000 for the fraudulent misrepresentation and FDUTPA claims. Additional damages were imposed on Grant Mason and the Mayfields. The district court ordered the clerk to "terminate this case with regard to the following Defendants: . . . Randal Pike, and Jessica Pike," and directed the clerk to close the case.

One month later, Freeman filed a motion to vacate the judgment against him, or in the alternative, for a new trial. The district court denied the motion, stating it was "in complete agreement with Plaintiffs' marshalling of the relevant facts established at trial" and that the court would not "substitut[e] its judgment for that of the jury."

Freeman appealed. He argues the district court should have granted judgment as a matter of law, or in the alternative a new trial, on the fraudulent misrepresentation and FDUTPA claims because his statements were not false and because he owed no duty to disclose. He also challenges the amount of damages recoverable on the FDUTPA claim.

## II.  JURISDICTION

Before evaluating the merits of Freeman's claims, we must address our jurisdiction to hear this appeal. See Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d

6

405, 410 (11th Cir. 1999) ("[I]t is well settled that a federal court is obligated to inquire into subject matter jurisdiction <u>sua sponte</u> whenever it may be lacking."). This Court has "jurisdiction of appeals from all final decisions of the district courts." 28 U.S.C. § 1291. "A final order is one that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." <u>Huie v. Bowen</u>, 788 F.2d 698, 701 (11th Cir. 1986) (quotation omitted); <u>see also</u> Fed. R. Civ. P. 54(b) ("[A]ny order . . . that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action . . . ."). In evaluating whether a district court's order is a final, appealable order, "we take a functional approach, looking not to the form of the district court's order but to its actual effect." <u>Birmingham Fire Fighters Ass'n 117 v. Jefferson Cty.</u>, 280 F.3d 1289, 1293 (11th Cir. 2002) (quotation omitted).

At issue is the district court's October 20, 2016 order staying the case as to Randal Pike and Jessica Pike because of their pending bankruptcy. If the April 11, 2017 final judgment did not apply to the Pikes, then there would be remaining claims for the district court to adjudicate. <u>See</u> <u>Corsello v. Lincare</u>, 276 F.3d 1229, 1230 (11th Cir. 2001) (per curiam) (finding no jurisdiction where district court's final order failed to adjudicate claims against a defendant in a pending bankruptcy). We asked the parties to address this jurisdictional question in simultaneous briefing. Freeman filed a response asserting that the final judgment

applied to the Pikes, thus rendering it a final, appealable order. The Whites filed no response.

We are persuaded that Freeman's position is correct and that we have jurisdiction to hear this appeal. The Pikes' bankruptcy was discharged on September 7, 2016, and the bankruptcy case was closed on November 3. When the district court entered final judgment five months later, it instructed the clerk to "terminate this case with regard to . . . Randal Pike, and Jessica Pike." This case is thus distinguishable from Corsello, where a district court's final order specifically exempted a defendant whose case had been automatically stayed by a pending bankruptcy. See id. While the district court here used the term "terminate" and not "dismiss" with regard to the Pikes, we look to the function of the court's order, not its terminology. Birmingham, 280 F.3d at 1293. By terminating the case as to the Pikes and simultaneously closing the case, the district court ended the case on the merits, and only the execution of the judgment remained.

We therefore conclude that the district court's April 11, 2017 final judgment was a final, appealable order and we have jurisdiction to hear this appeal.

### III. LEGAL STANDARD

"We review the denial of a motion for a judgment as a matter of law de novo." Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1275 (11th Cir. 2008). Applying the same standard as the district court, "[w]e will reverse only if the facts

8

and inference point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." Id. (quotation omitted). "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).

We review the denial of a motion for a new trial for an abuse of discretion. Lambert v. Fulton Cty., 253 F.3d 588, 595 (11th Cir. 2001). "[N]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001) (quotation omitted).

## IV.  FRAUDULENT MISREPRESENTATION

"To make a claim for fraudulent misrepresentation under Florida law, a plaintiff must allege: '(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation.'" Godelia v. Doe 1, 881 F.3d 1309, 1321 (11th Cir. 2018) (quoting Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010)).

Freeman asserts his statements to the Whites were not false when he made them.  However, even accepting this as true, a defendant can still be liable based

9

on material omissions.  See Gutter v. Wunker, 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994) (per curiam).  "[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed."  Id. at 1118–19.

Freeman argues he cannot be responsible for any omissions because he was not a party to the transaction, and therefore had no duty to disclose.  But Freeman had a financial and fiduciary relationship with one of the parties—he owned a 10% share in Grant Mason Holdings and was its COO.  At trial Freeman asserted that Grant Mason, LLC, and not Grant Mason Holdings, was the true party to the transaction.  However, Grant Mason Holdings, jointly with Grant Mason LLC, issued the promissory notes that provided the bulk of the payment to the Whites.  Beyond that, Freeman was not merely an officer and part-owner of Grant Mason Holdings.  He supplied Darryl Mayfield with the letter of intent for the transaction that was ultimately executed by the Whites.  Based on Freeman's position as an officer of Grant Mason Holdings, his financial interest in the transaction, and his role in supplying transaction documents, it is reasonable to conclude that Freeman owed a duty to disclose material facts once he chose to speak with the Whites.  See Gutter, 631 So. 2d at 1118–19 (finding a duty to disclose existed between attorneys for a restaurant and prospective purchasers when the attorneys failed to disclose past failed ventures and their own financial interest in the transaction); Vokes v.

10

Arthur Murray, Inc., 212 So. 2d 906, 909 (Fla. 2d DCA 1968) ("Even in contractual situations where a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, the law is if he undertakes to do so he must disclose the Whole truth.").

Freeman clearly omitted material information in his discussion with the Whites, beginning with his financial interest in the transaction. This interest may have created an incentive for Freeman to make other omissions, such as failing to tell the Whites he knew Grant Mason had defaulted on its obligations in other buyouts. See Gutter, 631 So. 2d at 1118 (failure to disclose involvement in a previous failed venture constituted a material omission). The Whites, thinking they had received an independent recommendation, relied on that recommendation to complete a deal they say they wouldn't have otherwise done.

On these facts, the district court did not err in denying Freeman's motion for judgment as a matter of law. Neither did it abuse its discretion by denying the motion for a new trial.

## V. FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

### A. LIABILITY

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "A consumer claim for damages under

FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." City First Mortg. Corp. v. Barton, 988 So. 2d 82, 86 (Fla. 4th DCA 2008). A deceptive act can include any omission that "is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." PNR, Inc. v. Beacon Prop. Mgmt., 842 So. 2d 773, 777 (Fla. 2003) (quotation omitted); see also Davis v. Powertel, Inc., 776 So. 2d 971, 973 (Fla. 1st DCA 2000) ("A party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." (emphasis added)).

For this claim, too, Freeman argues that he could not have committed a deceptive act because his statements were not false when they were made and, because he was not a party to the transaction, he owed no duty to disclose material information. But as discussed above, Freeman did have a duty to disclose material information to the Whites once he voluntarily agreed to speak with them.[1] Therefore his argument is unavailing for this claim as well. The district court did not err by denying his motion for judgment as a matter of law or for a new trial on this claim.

B. DAMAGES

Under FDUTPA, a plaintiff can recover actual damages, but not consequential or other special damages. Dorestin v. Hollywood Imports, Inc., 45

---

[1] Freeman makes no suggestion that Florida's general law on the duty to disclose differs in the FDUTPA context, and we are not aware of any reason those doctrines should differ.

12

So. 3d 819, 824–25 (Fla. 4th DCA 2010).  Florida courts have explained that "the measure of actual damages is the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties."  Rollins, Inc. v. Heller, 454 So. 2d 580, 585 (Fla. 3d DCA 1984) (quotation omitted).

Freeman argues the Whites are not entitled to damages under FDUTPA because they received market value during the sale of Ideagear, and the only damages they incurred happened after the closing of the transaction.  Freeman is correct that certain damages inflicted after closing—such as loans taken out in Ideagear's name and the ruination of Ideagear's reputation with its suppliers—are consequential damages, not recoverable under FDUTPA.  See Fort Lauderdale Lincoln Mercury, Inc. v. Corgnati, 715 So. 2d 311, 314–15 (Fla. 4th DCA 1998) (collecting cases demonstrating difference between actual and consequential damages in Florida).  But FDUTPA does allow the Whites to recover the damages they incurred by receiving consideration at closing that was less valuable than was represented.

At the time of the sale, Ideagear was valued at approximately $1.7 million, which was the purchase price for the sale.  But the Whites did not receive that amount in cash.  They received promissory notes from Grant Mason, along with a

13

promise to be employed as marketing directors for Ideagear.  Given Grant Mason's financial difficulties and checkered past in completing purchases, the risk that Grant Mason would default on those notes was high, so the notes were less valuable than the Whites believed.  This was unknown to the Whites, in part due to Freeman's deception.  Therefore they were entitled to recover the difference between the agreed-upon purchase price and the actual value of the promissory notes and pledges they received at closing.  See id. at 314.

At trial, the Whites demonstrated that Freeman knew Grant Mason had defaulted on its obligations when buying other companies.  The Whites also testified they received no payments on the promissory notes, and that Grant Mason did not honor its promise to pay their salaries as officers of Ideagear.  After hearing this evidence, the jury set the amount of FDUTPA damages at $500,000.  Freeman has offered no argument or authority showing why this award of damages was unreasonable or incorrectly calculated.  Therefore we affirm the award of damages under FDUPTA.

**AFFIRMED**

14